U.S.A. v. KANE
CASE NO. 3:06-mj-00011-JDR

TRANSCRIPT OF PROCEEDINGS
FEBRUARY 7 & 8, 2006

---

Page 82

1   these aircraft. These pods are the instrumentality of them
2   that -- you load them up, they're active, they're ready to go.
3   You're missing a couple of switches at best from -- at least
4   from their perspective. So at least at -- on -- at this stage
5   of the proceedings, Your Honor, preliminary hearing, we've
6   established probable cause, and there isn't any evidence to the
7   contrary. Thank you.
8       THE COURT: The Court will decide the matter at this time.
9   The charge is contained in the complaint and it's limited to
10  what's in the complaint, which is knowingly receiving and
11  possessing and knowingly attempting to receive and possess a
12  firearm. So the Government can show alternatively the receive
13  or possess or knowingly attempt to receive or knowingly attempt
14  to possess. The firearm is identified as a rocket pod launcher,
15  16 by 57 millimeters. The elements -- and also it says it's not
16  registered to him. So the Government must prove that the def--
17  that did receive or possess a firearm, which under the
18  definitions of the law includes the rocket pod launcher, the
19  firearm was not registered to him in the National Firearms
20  Registry and Transfer Record, and third, the Government must
21  show probable cause that the defendant knew that the object he
22  possessed was a dangerous device.
23      I have heard evidence today about some pod launchers that
24  were sold through eBay-type computer. The evidence indicates
25  from witnesses that the Government relies upon at this point

---

Page 83

1   that the defendant played in a part in or knew about the
2   ordering of those, they were delivered, and I think, very
3   significantly, the statement attributed to the defendant that
4   now he could have some target practice. These witnesses
5   themselves have not testified here today and they've not been
6   required to because this is a preliminary hearing. The purpose
7   of this hearing is to see if there's enough evidence to warrant
8   holding the defendant to answer to the charge. It's not a test
9   of all credibility or reliability of all of the evidence, and
10  it's not beyond a reasonable doubt that has to be met at any
11  trial.
12      We have at least one of those witnesses, federal security
13  aviation, FS-- TSA, I'm sorry, TSA Officer Hooks, who has a law
14  enforcement background, and then we have the information that
15  was given to the Government that these pods existed and then you
16  heard testimony here today that two pods were seized. In terms
17  of control as a principal, the evidence about the principal of
18  the business, reputed to have an ownership interest, again,
19  these things not fully tested, but this is not the trial. The
20  name of the defendant on the seat -- and so we don't know so
21  much today about Commander Kane and this role that's been
22  presented, but, again, there's a lot to flesh out, and that
23  comes through discovery, pretrial motion practice, the trial of
24  the case, if it gets to all those stages.
25      I think the Government has provided probable cause as to

---

Page 84

1   each of the three elements that I've mentioned -- again, the
2   fact of knowing that the object was a dangerous device by the
3   very nature of it, and also the statement about it being used
4   for target practice. The law provides that the Government is
5   not required to prove that a defendant with possession of an
6   unregistered destructive device possessed components of such
7   device with intent to use them as a weapon. We don't know what
8   the purpose was here. It's not come out in this hearing. The
9   question is whether it was registered and whether it should have
10  been, not whether it's registered to a prior owner, but whether
11  he possessed something that was not registered. There's been no
12  evidence that it's registered to anybody, but certainly not to
13  Mr. Kane. And so I think the Government has produced enough
14  evidence here to meet its burden.
15      The defendant is held to answer to the next sitting
16  federal grand jury who will have an opportunity if presented to
17  consider the probable cause of this issue. If they -- so the
18  Government is duty bound to present this to the next federal
19  grand jury. Otherwise, the complaint might be dismissed.
20      Having held the defendant to answer, I'll open it up for
21  any additional evidence on the issue of bail. Probable cause
22  issue has already been determined. What's the Government's
23  position on bail?
24      MR. SKROCKI: Our position is -- remains unchanged, Your
25  Honor, that Mr. Kane is a significant flight risk, as well as a

---

Page 85

1   danger to the community. We'd request he be detained. We can
2   present additional evidence as to the flight and danger issue
3   now.
4       THE COURT: Are you relying upon a statutory presumption?
5       MR. SKROCKI: In this case, no. It does not apply.
6       THE COURT: Not as a violent -- possessing something -- a
7   violent instrument.
8       MR. SKROCKI: My reading of it -- if the Court so finds, I
9   would agree. My reading of it, however, was that it did not
10  apply. I could revisit that.
11      THE COURT: This is the time for evidence, so I don't want
12  to hear what you could present or what you should have. Either
13  present the evidence or not. If you're not relying upon the
14  statutory presumption, then you.....
15      MR. SKROCKI: We have -- even if I was.....
16      THE COURT: .....have the burden of going forward.
17      MR. SKROCKI: .....Your Honor, I'd have a witness ready to
18  go who's here. Shawn Clapp, please.
19      THE COURT: I'll hear the Government's evidence first, and
20  then, Mr. Spaan, you'll have a chance to put on evidence as
21  well.
22      MR. SPAAN: Thank you, Your Honor.
23      THE CLERK: Sir, please stand before me to be sworn.
24  Raise your right hand.
25      (Oath administered)

---

MIDNIGHT SUN COURT REPORTERS
(907) 258-7100

EXHIBIT # _____ C _____
Page # ___ 22 ___ of ___ 62 ___

U.S.A. v. KANE
CASE NO. 3:06-mj-00011-JDR

TRANSCRIPT OF PROCEEDINGS
FEBRUARY 7 & 8, 2006

Page 86

1   MR. CLAPP: Yes, I do.
2   THE CLERK: Thank you. Please have a seat in the witness
3   box.
4                AGENT SHAWN CLAPP
5   called as a witness on behalf of the plaintiff, testified as
6   follows on:
7                DIRECT EXAMINATION
8   THE CLERK: Please be sure to speak into that microphone
9   at all times. Please state your full name, spelling your last
10  name.
11  A   Shawn Clapp, C-l-a-p-p.
12  THE CLERK: And can you spell your first name, also?
13  A   S-h-a-w-n.
14  THE CLERK: Thank you.
15  THE COURT: You may inquire.
16  BY MR. SKROCKI:
17  Q   Agent Clapp, would you tell the Judge who you're employed
18      by?
19  A   I'm employed with the Federal Air Marshal Service.
20  Q   And how long have you been with the Air Marshal Service?
21  A   Just about four years.
22  Q   Did you have occasion to participate in the search and
23      search warrant of Mr. Kane's residence last week?
24  A   Yes, I did.
25  Q   Do you recall what the address was?

Page 87

1   A   I would have to look it up. It's a house on Magna (ph)
2       View out.....
3   Q   Okay.
4   A   .....in Eagle River.
5   Q   Eagle River?
6   A   Yes.
7   Q   Okay. End of the road out in Eagle River?
8   A   Yes.
9   Q   Okay. And what type of house was it, the physical
10      description?
11  A   It was a single-family residence, wood structure.
12  Q   Big, small?
13  A   Three story, downstairs and a main floor and an upstairs,
14      approximately -- I think it was over 4,000 square feet.
15      It's pretty large.
16  Q   Four thousand square feet?
17  A   About. Somewhere.....
18  Q   All right.
19  A   .....in there.
20  Q   During the course of that search did you have occasion to
21      talk to Mrs. Kane?
22  A   Yes, I did, several times through the -- the day.
23  Q   You did? Okay. And she provided you consent to look
24      through the house?
25  A   She provided (indiscernible) she provided consent to

Page 88

1       another agent on the scene and several times throughout
2       the day she relayed her consent to many of us, actually.
3   Q   And did you find any items like cash during the course of
4       your search of the house?
5   A   Yes, we found over $20,000 in cash in a few envelopes in a
6       briefcase and in a jacket.
7   Q   Okay. Was there any identification associated with that
8       $20,000?
9   A   There were several items of identification in the
10      briefcase and the jacket belonging to Robert Kane.
11  Q   How long were you in the residence, Agent Clapp?
12  A   Somewhere between nine and 10 hours, somewhere around
13      there.
14  Q   Okay. If I can have you open the yellow folder I've
15      placed in front of you? That' Exhibit No. 3. You see
16      that?
17  A   A photograph?
18  Q   Yeah, the color photograph?
19  A   Yes.
20  Q   And there's -- was there some accompanying documentation
21      that is reflected in Exhibit 4 for Mr. Kane?
22  A   Yes, there is.
23  Q   Okay, could you look at the photograph in Exhibit 3 and 4
24      and Mr. Kane, and does it appear to be the same person?
25  A   Yes, it does.

Page 89

1   Q   Now, you really can't talk about 3 until you look at 4, so
2       let's back up just a second and look at No. 4 there, and
3       it's some identification. Do you see that?
4   A   Yes, I do.
5   Q   It's a document that's from the Philippine Coast Guard?
6   A   Yes, it appears to be an identification card from the
7       Filipino Coast Guard.
8   Q   Okay. But it's coast guard auxiliary, correct.
9   A   Yes.
10  Q   All right, and then there's -- if you go down it says --
11      there's some information on the left-hand side. See where
12      that's -- what does that say?
13  A   Has the name of Robert F. Kane, rank of commander, a
14      control number, an ID number, and an expiration date.
15  Q   And the date of expiration is when?
16  A   December 31st, 2004.
17  Q   Okay. And if you go back to Exhibit No. 3, that's an
18      8-1/2 -- that's a glossy photograph of what appears to be
19      Mr. Kane, correct?
20  A   Yes.
21  Q   And he's wearing a hat that's -- can you tell if that's
22      says Philippine Coast Guard Auxiliary on the hat?
23  A   Yes, it says Philippine Coast Guard Auxiliary.
24  Q   Okay. I want to direct your attention to the fruit salad
25      on the left-hand side, on his left side of his chest. Do

23 (Pages 86 to 89)

EXHIBIT #_____C_____
Page #___23___ of ___62___

U.S.A. v. KANE
CASE NO. 3:06-mj-00011-JDR

TRANSCRIPT OF PROCEEDINGS
FEBRUARY 7 & 8, 2006

Page 90

1     you see that?
2   A   Yes, I do.
3   Q   Okay. Now, Agent Clapp, were you in the U. S. military?
4   A   No, I'm not currently, no.
5   Q   Were you?
6   A   Yes, I was.
7   Q   What -- in what branch of service, sir?
8   A   The Marine Corps.
9   Q   How long were you in the marines?
10   A   Around seven years.
11   Q   What kind of service did you do?
12   A   I was an infantryman for my first four years. After the
13     Gulf War I was assigned to embassy duty where I worked in
14     embassies in Damascus, Syria and Rome, Italy.
15   Q   Did you serve in Kuwait?
16   A   I served in Saudi Arabia.
17   Q   Saudi Arabia?
18   A   Yes.
19   Q   Okay. Do you recognize some of the -- forgive me -- the
20     bars and the decorations on the left-hand side? Do you
21     recognize some of those?
22   A   Yes, I recognize the majority of the ribbons represented
23     here.....
24   Q   And.....
25   A   .....on the uniform.

Page 91

1   Q   .....what do they represent?
2   A   Various personal -- actually, I believe all of them are
3     personal commendations awarded to someone who had been a
4     member of the military.
5   Q   To your knowledge was Mr. Kane a member of the U. S.
6     military?
7   A   No.
8   Q   Okay, let's talk about some of those medals or those
9     awards. What are they?
10   A   Representing here on -- in the ribbons I see what -- let's
11     see here -- you got a Navy cross represented.....
12   Q   Navy cross?
13   A   Yes.
14   Q   What's that awarded for?
15   A   Usually valor in combat. It's one of the highest awards
16     in the Navy.
17   Q   All right. What else do you have?
18   A   Looks like a legion of merit, a purple heart, Navy
19     achievement medal, a combat action ribbon, a national
20     defense service medal, overseas deployment ribbon, a
21     Kuwait liberation medal awarded by the government of
22     Kuwait, a Kuwait liberation medal awarded by the
23     government of Saudi Arabia, and it looks like two Navy
24     qualification ribbons.
25   Q   Okay. So those are awards you'd receive had you been in

Page 92

1     the U. S. military?
2   A   Yes.
3   Q   Civilians wouldn't get those.
4   A   No.
5   Q   Based on -- as you understand it.
6   A   Yes.
7   Q   And do you recall where these items were found?
8   A   The photograph?
9   Q   Yeah, the photograph and the identification card.
10   A   The photograph was found in the upstairs master bedroom
11     somewhere, and I'd have to look at the inventory for sure
12     because we recovered several identification cards of this
13     nature. Somewhere in the residence.
14     MR. SKROCKI: Move to admit 3 and 4.
15     MR. SPAAN: No objection, Your Honor.
16     THE COURT: Admitted.
17            (Plaintiff's Exhibits 3 and 4
18            admitted)
19   Q   Let me have you look at number 7. Have that there in
20     front of you?
21   A   Yes, I do.
22   Q   There's six copies of medals referenced on Exhibit 7.
23   A   Yes.
24   Q   What would you call those in your vernacular?
25   A   These are personal commendations, medals awarded.

Page 93

1   Q   Okay, and if you can go from the left to right, what do
2     they represent as you understand?
3   A   The one on the left is a Navy cross. The next one to the
4     right is the Kuwait liberation medal awarded by the
5     government of Kuwait. The next one is a purple heart.
6     Then you have a distinguished service medal, Navy
7     distinguished service medal, a national defense service
8     ribbon -- or medal, and Kuwait liberation medal awarded by
9     the government of Saudi Arabia.
10   Q   Would you able -- are you able to get those if you -- or
11     would you be able to be awarded those if you were a
12     civilian?
13   A   No.
14   Q   Exhibit No. 5?
15   A   I have it here.
16   Q   You have that?
17   A   Yes.
18   Q   There we have a number of items of identification on
19     there. Those were taken from the house as well?
20   A   That's correct.
21   Q   Okay, what do they represent?
22   A   The -- one of the photographs represents -- a photocopy
23     represents a black -- what we call a credential wallet
24     with a fugitive recovery agent identification card with a
25     photograph of Robert Kane, a -- below that is another

MIDNIGHT SUN COURT REPORTERS
(907) 258-7100

EXHIBIT # _____C_____
Page # ___24___ of ___62___

U.S.A. v. KANE
CASE NO. 3:06-mj-00011-JDR

TRANSCRIPT OF PROCEEDINGS
FEBRUARY 7 & 8, 2006

Page 94

1    photograph of Robert Kane, and a concealed weapons permit
2    badge with a United States seal on it and the words the
3    United States of America.
4    Q    Are you familiar in your law enforcement role with a badge
5    of that nature with the concealed weapons permit from the
6    United States of America?
7    A    There's nothing official of that nature. You can order
8    those off of the Internet. I've seen them quite often.
9    Q    You've seen those before in your experience?
10   A    Yes.
11   MR. SKROCKI: All right. Move for the admission of 7 and
12   5, Judge.
13   MR. SPAAN: No objection, Your Honor.
14   THE COURT: Admitted.
15          (Plaintiff's Exhibits 5 and 7
16          admitted)
17   Q    Now, just briefly, Agent Campe, as to number -- I'm sorry,
18   Agent Clapp -- as to number 5 the fugitive recovery agent
19   credential badge, right?
20   A    Yes.
21   Q    That's attached to this concealed weapons permit, correct?
22   A    To a badge that says that, yes.
23   Q    Right, so like in the same billfold, am I right about
24   that?
25   A    That's correct.

Page 95

1    Q    All right. And that has an issue date up on the upper
2    left-hand side?
3    A    Yes, it does.
4    Q    That says August 1st, 2001?
5    A    Yes.
6    Q    And was there an expiration to it?
7    A    Not that I can read here.
8    Q    Is the wording not legible for you?
9    A    Are we on the concealed -- oh, it says indefinite,
10   actually. I can see it here, yes.
11   Q    Okay, so it says indefinite?
12   A    Yes.
13   Q    So to the uninitiated this would be still valid.
14   A    Correct.
15   Q    Let's look at number 9. Last one in the stack, right?
16   A    Not quite. Just about.
17   Q    Okay, number 9, if you could tell the Judge what that
18   represents, and was that found in the house as well?
19   A    Yes, it was.
20   Q    Okay. What are those?
21   A    We have two -- excuse me -- you have two badges that
22   say -- actually, one says fugitive recovery agent, similar
23   to a U. S. marshal badge, and one of them says bail
24   enforcement agent, and then another credential that says
25   bail enforcement agent, and the one below that says bail

Page 96

1    enforcement agent.
2    Q    Okay. Now, there's some badges on the left-hand side of
3    that on the front page of Exhibit No. 9?
4    A    Yes.
5    Q    See that? Those are -- there's two badges there. Are --
6    were those like real -- I mean, describe for the Court
7    what you saw with those.
8    A    Basically, a star with a circle in it, and like I said,
9    similar to a U. S. marshal's badge, and the words fugitive
10   recovery agent, again along with bail enforcement agent,
11   and I believe the -- the bottom one was attached to a
12   leather holder, had a silver chain.....
13   Q    Okay.
14   A    .....to -- to hold it around your neck.
15   Q    In the center of the badge there's a U. S. -- what appears
16   to be like a United States eagle?
17   A    Yes, it appears to be a United States seal.
18   Q    Okay, and there's the "e pluribus unum" on the top of
19   that?
20   A    Yes.
21   Q    And the ribbon as you would see? Almost like you see
22   right there.
23   A    Correct.
24   Q    Is that actually a duplicate of what you see right there?
25   Above Judge Roberts' head.

Page 97

1    A    It is, yes.
2    Q    But in a badge format, though, so you'd be flipping this
3    out to somebody.
4    A    This one here, actually, you'd be wearing it around your
5    neck.
6    Q    Okay. And if you'd turn to the next page of Exhibit
7    No. 9? There's some heavy metal there, too, is there not?
8    A    Yes, there are two more badges represented here.
9    Q    Okay. One is the -- the one on the lft-hand side of that
10   photograph is a fugitive recovery badge?
11   A    Yes, again, another fugitive recovery agent, and a similar
12   badge with the United States seal represented on a star,
13   and the other one is more along the lines of a state
14   police officer or a city police officer-type shield.
15   Q    Okay, it says Nevada bail enforcement, correct?
16   A    Correct.
17   Q    Okay, and there could very well be a Nevada bail
18   enforcement agent. Do you know -- do you have any
19   information about that?
20   A    I don't have any personal experience with that.
21   MR. SKROCKI: Okay. Move for the admission of number 9.
22   MR. SPAAN: No objection.
23   THE COURT: Admitted for this hearing.
24          (Plaintiff's Exhibit 9 admitted)
25   Q    Let me have you go to number 10, Agent Clapp. Did you

25 (Pages 94 to 97)

MIDNIGHT SUN COURT REPORTERS
(907) 258-7100

EXHIBIT # _____C_____
Page # ___25___ of ___62___

U.S.A. v. KANE
CASE NO. 3:06-mj-00011-JDR

TRANSCRIPT OF PROCEEDINGS
FEBRUARY 7 & 8, 2006

Page 98

1    have occasion to speak with Mr. Kane's wife?
2  A  Yes, I did.
3  Q  All right.  And you spoke with her, I think you -- I
4    believe you said you spoke to her a couple of times during
5    the course of that day?
6  A  Numerous times throughout the day, yes.
7  Q  All right.  And Exhibit No. 10, what does that represent?
8  A  This appears to be a photocopy of a Greek passport.
9  Q  Is there a photo associated with that passport?
10 A  Yes, it is a photograph of who I knew as Maria Kane.
11 Q  The defendant's wife?
12 A  Yes.
13 Q  Is she Greek?
14 A  No.
15 Q  Could you explain to the Court what you know about
16    Mrs. Kane?
17 A  Mrs. Kane is a Filipino national from the island of
18    Mindanao in the southern Philippines.
19 Q  And do you recall where this Philippine passport with
20    Mrs. Kane's picture on it came from?
21 A  I believe this was discovered in the dining room area.  I
22    did not find this passport.  I did look at it after it was
23    found.
24 Q  All right.  She's not Greek to your knowledge.
25 A  No, I asked her specifically if she was Greek or why she

Page 99

1    had a Greek passport.  She said she didn't know why she
2    had a Greek passport.
3  Q  Did she tell you where she was from?
4  A  She said she was from the Philippines, the island of
5    Mindanao.
6  Q  Now, you mentioned that -- was it $22,000 in cash you
7    found?
8  A  I'd have to refer to my report, but it was somewhere
9    around there.
10 Q  Okay.  What denominations?
11 A  There were several hundreds and twenties.
12 Q  And maybe you -- if you'd tell Judge Roberts how -- and
13    where was that located and other accompanying paperwork
14    that was with it?
15 A  Sure.  There was a black ballistic nylon, very large
16    briefcase seated in the kitchen at the -- near a breakfast
17    bar-type area on the -- the stools.  Hanging on the stool
18    also was a jacket.  Inside the briefcase were numerous
19    manila file folders with words top secret and logos from
20    various intelligence agencies.  Also inside there were two
21    passports belonging to Robert Kane, one which was expired
22    and one was valid.  They were als-- again, there was
23    envelopes containing the cash, regular, plain white
24    business-type envelopes containing the cash, and there was
25    another billfold that contained numerous bank cards

Page 100

1    representing international bank accounts for different
2    banks.
3  Q  Do you have some samples of those, those bank cards and
4    this wallet in front of you?
5  A  I'll look here.
6  Q  Sure.  Would that be Exhibit 8?
7  A  Exhibit 8.
8  Q  Behind the passport.
9  A  Yes, I have it here.
10    MR. SPAAN:  Your Honor, if we could have a second to
11    locate number 8, I'm not sure that we have it.
12    MR. SKROCKI:  It'd be right behind (indiscernible).
13    MR. SPAAN:  We've got it, Your Honor.  Thank you.
14 Q  So Exhibit No. 8 on the front page there is -- looks like
15    a photo of the expired passport and then the valid
16    passport?
17 A  That's correct.
18 Q  Okay, and that's in FBI custody, correct?
19 A  Yes.
20 Q  Okay.  And on the back of it, you turn the page over,
21    there's some other items, and if you can just maybe --
22    you've got going from my right, your left, yeah, up and
23    down the page, we've got some sat. phone numbers?
24 A  Yes, there's a list of four satellite telephone numbers.
25 Q  And there's one for Mark?

Page 101

1  A  Yes.
2  Q  One for Rob?
3  A  Yes.
4  Q  Matt?
5  A  Correct.
6  Q  And Skip.
7  A  Correct.
8  Q  Okay.  And there's a APD police card number or card for
9    Ted Smith, Sergeant Smith?
10 A  Correct.
11 Q  And then skipping over the Junior Chamber of the
12    Philippines card there's a -- looks like a bank card.
13 A  Correct, it's an HSBC Power Advantage bank card.
14 Q  All right, and then there is -- upper right there's a card
15    from the Philippine consulate general.
16 A  Yes.
17 Q  Business card.
18 A  Yes.
19 Q  Moving down to the middle there's a fugitive recovery
20    agent card.
21 A  Yes, there is.
22 Q  Card from the Philippine police?
23 A  Correct.
24 Q  Going down further, and then the last one is another bank
25    card, it appears, from HSBC.

26 (Pages 98 to 101)

MIDNIGHT SUN COURT REPORTERS
(907) 258-7100

EXHIBIT # _____ C_____
Page # __26__ of __62__

U.S.A. v. KANE
CASE NO. 3:06-mj-00011-JDR

TRANSCRIPT OF PROCEEDINGS
FEBRUARY 7 & 8, 2006

Page 102

1  A   Correct again.
2  Q   Correct? Issued on June of '03.
3  A   Yes.
4  Q   Turn the page one more time. How many bank cards do you
5      see there, agent?
6  A   Definitely four, and possibly a third. It's a SMART Money
7      card. I'm not familiar with it. Appears to be like a
8      MasterCard type of card.
9  Q   Okay, the SMART Money card has a sticker on it, right?
10     It's not -- seems like it's not activated yet.
11  A  That's correct, has not been activated yet, apparently.
12  Q  There's a phone number there that says call this number to
13     activate your card?
14  A  Yes.
15  Q  Then we have what looks like a communications business
16     card there to the left, correct? Bottom left.
17  A  Yes. It appears to be a -- like a key card to a satellite
18     phone.
19  Q  You have experience in those matters?
20  A  Not a whole lot. Our -- our satellite phones don't use
21     these key cards, but I've seen them here and there.
22  Q  Something similar to that, then?
23  A  Yes.
24  Q  And then there's a card for a trooper out -- on the right-
25     hand side -- out in Big Lake, correct?

Page 103

1  A   Correct, a business card.
2  MR. SKROCKI: Move for the admission of 8.
3  MR. SPAAN: No objection, Your Honor.
4  THE COURT: Exhibit 8 admitted.
5       (Plaintiff's Exhibit 8 admitted)
6  MR. SKROCKI: And 10, if I haven't already done so.
7  THE COURT: No, it's not in yet.
8  MR. SPAAN: Let me just check 10. I don't think we're
9  going to have an objection.
10  THE COURT: Copy of the Greek passport.
11  MR. SPAAN: No objection, Your Honor.
12  THE COURT: Admitted.
13       (Plaintiff's Exhibit 10 admitted)
14  Q  Let's go to number 12. Sorry to jump around on you like
15     this. They were out of order. Let's go to number 12.
16  A  I have it here.
17  Q  Okay. That came from where?
18  A  I believe this was taken out of a -- either a black or
19     dark blue Chevy Tahoe parked in the driveway.
20  Q  Okay. There's some information on there. It says wiring
21     information. Do you see that?
22  A  Yes, I do.
23  Q  Okay. And there's two represented listings there, two
24     different locations. Do you see those?
25  A  Yes, there's one for Avery & Associates, and then an

Page 104

1      account number listed after that, and the other one is for
2      Regional Protective Services, again with another account
3      number.
4  Q   And wiring stands for what?
5  A   It's a method to electronically transmit funds from one
6      financial institution to another.
7  Q   Okay, so on both of these you've got a bank, the same bank
8      for Avery & Associates, the same bank for RPS, correct?
9  A   Correct.
10  Q  RPS being Regional Protective Services.
11  A  Yes.
12  Q  And there's -- looks like -- see an account number?
13  A  One of the account numbers is the same. However, after
14     the -- after the name of the business there are different
15     consecutive account numbers also listed.
16  Q  Okay, so two separate accounts.
17  A  It appears there are two separate accounts yes.
18  Q  Okay. I'm sorry, I was looking at the ABA numbers. Looks
19     like they'd be the same bank, 026007993?
20  A  Yeah, it appears to UBS bank.
21  MR. SKROCKI: Okay. Move for Exhibit 12 for admission.
22  MR. SPAAN: No objection.
23  THE COURT: Admitted.
24       (Plaintiff's Exhibit 12 admitted)
25  Q  Agent Clapp, let's back down one number to number 11.

Page 105

1      Could you thumb through those for me briefly? What are
2      those, Agent Clapp?
3  A   These are wire transfer -- money transfer receipts, most
4      of them from a Western Union subsidiary business.
5  Q   Okay. They're actually money being sent to Mr. Kane, at
6      least as of the first page of Exhibit 11, correct?
7  A   Correct.
8  Q   How much is being sent?
9  A   The denom-- denominations range from 400 to $600, various
10     denominations.
11  Q  And Mr. Kane's the receiver on almost all of these, is he
12     not?
13  A  It appears he's the receiver on all of them, yes.
14  Q  And then at the last two pages, I believe, 93, there are
15     some blank forms there to receive money.
16  A  Correct.
17  Q  They had not been used yet.
18  A  That -- that is correct.
19  MR. SKROCKI: Move the exhibit -- admission of 11, please.
20  MR. SPAAN: No objection.
21  THE COURT: Exhibit 11 is admitted.
22       (Plaintiff's Exhibit 11 admitted)
23  Q  Okay, I think the last one is number 12. Sorry about
24     that.
25  MR. SPAAN: 6? I'm sorry.

27 (Pages 102 to 105)

EXHIBIT # _____C_____
Page # __27__ of __62__

U.S.A. v. KANE
CASE NO. 3:06-mj-00011-JDR

TRANSCRIPT OF PROCEEDINGS
FEBRUARY 7 & 8, 2006

---

Page 106

1     MR. SKROCKI: 6.
2 Q  Have you seen those documents before, the copies that
3     are.....
4     MR. SPAAN: Your Honor, if we could have one second to
5  locate 6? We've been jumping around on these.
6     MR. SKROCKI: Here you go.
7     MR. SPAAN: Oh, I -- I'm sorry, I have it now.
8 Q  Agent Clapp, have you thumbed through the documents marked
9     as Exhibit 6?
10 A  Yes.
11 Q  If you can go through each one of these one by one and
12     tell us where these were found first.
13 A  These particular items were also located inside the
14     ballistic nylon briefcase that contained the 20-plus-
15     thousand dollars and the passports, the international bank
16     cards and.....
17 Q  And his wallet?
18 A  And his wallet, ID cards.
19 Q  So how many pieces of paper do you have there?
20 A  Five.
21 Q  They represent -- each one represents something different,
22     correct?
23 A  That is correct. They're.....
24 Q  Start with the first page.
25 A  The first one is what you might typically see as a typed

---

Page 107

1     top secret cover sheet; however, these are -- these all
2     represent manila file folders that had in color these
3     printed on them.
4 Q  Okay, so we'd have like a manila cover, manila -- the
5     little file folder?
6 A  Correct.
7 Q  Right? And this would be on the cover?
8 A  Correct, this was printed on the cover. Probably --
9     looked like using an inkjet printer, just printed directly
10     onto the manila folder.
11 Q  Would you call it low-quality printing?
12 A  No, it was actually pretty good quality.
13 Q  Yeah? Okay. And it says top secret?
14 A  Yes. It's -- it's not what I would -- it's not the top
15     secret cover sheet that I see in use officially. However,
16     it looks official. It appears to be an imitation of an
17     official top secret cover sheet.
18 Q  And why -- what makes it different? Based on your
19     experience.
20 A  Based on my experience, we don't generally list the
21     storage and handling requirements on the cover sheet, and,
22     also, the color, it was orange, and that's not a color
23     that we generally use.
24 Q  Because that's secret, right?
25 A  No, that would -- secret would be red.

---

Page 108

1 Q  Red, okay.
2     THE COURT: It's not.....
3 Q  So if it's secret.....
4     THE COURT: .....a secret now.
5 Q  .....it should be red.
6     THE COURT: It's not a secret color now.
7 Q  Not anymore. So if it's secret, it should be red.
8 A  Correct.
9 Q  All right. Okay. This one was orange.
10 A  Yes.
11 Q  So in your experience it's the wrong color.
12 A  Wrong color, wrong -- wrong verbiage used.
13 Q  Okay. Let's go to the next one.
14 A  Next one appears -- again, it was -- represents what was
15     printed directly onto a manila env-- or manila file
16     folder, and it's a -- the United Nations symbol or
17     logo.....
18 Q  Uh-huh.
19 A  .....and the words UN Multinational Force, and then the
20     classification confidential written below that.
21 Q  Okay, and so this says UN Multinational Force, with the
22     symbol, and confidential underneath.
23 A  Correct.
24 Q  Now, you were part of the UN Multinational Force when you
25     did your time, were you?

---

Page 109

1 A  No, I worked with them.
2 Q  Okay. Did you ever see anything like this?
3 A  No. I didn't see anything like this.
4 Q  The next one represents another sort of cover of a manila
5     file folder?
6 A  Correct. It also represents another cover of another
7     folder and has the words National Intelligence Agency
8     written on it, and below that the classification
9     confidential, and there appears to be very light printing
10     behind that, a logo of sorts. It's like a laurel wreath
11     with an eagle holding arrows.
12 Q  So that's a different agency that the UN Multinational
13     Force.
14 A  I've never heard of this agency.
15 Q  The National Intelligence Agency?
16 A  I've never heard of it, no.
17 Q  The next page? You've probably heard of this agency.
18 A  Yes, I have.
19 Q  And what does this one purport to be?
20 A  This again has -- this has a logo. It's from a manila
21     folder. The logo's the Central Intelligence Agency seal,
22     and it has the -- the writing -- the words top secret
23     written on it.
24 Q  And this was found along with the National Intelligence
25     Agency and the Multinational Force and.....

---

28 (Pages 106 to 109)

EXHIBIT # _____ C_____
Page # __28__ of __62__

U.S.A. v. KANE
CASE NO. 3:06-mj-00011-JDR

TRANSCRIPT OF PROCEEDINGS
FEBRUARY 7 & 8, 2006

Page 110

1   A   Yes.
2   Q   The last one seems to be from the Foreign Intelligence
3       Service.
4   A   It would appear to have -- to be representing Foreign
5       Intelligence Service, yes.
6   Q   All right. And this one represents what?
7   A   It has a -- the word MI6 written on it.
8   Q   Do you know who MI6 is?
9   A   Yes, I do.
10  Q   What do they do? If you can tell us.
11  A   MI6 would be British Intelligence Agency, focused mainly
12      on foreign intelligence for the British government.
13  Q   Okay, foreign as opposed to domestic.
14  A   Correct.
15  Q   All right. So this is MI6, British intelligence. Keep
16      going.
17  A   And below that it says Her Majesty's Secret Service.
18      There's a symbol of the crown, and below that is the --
19      what would be -- I guess he wanted it to be a
20      classification of eyes only.
21      MR. SKROCKI: Move the admission of 6.
22      MR. SPAAN: No objection, Your Honor.
23      THE COURT: 6 is admitted.
24              (Plaintiff's Exhibit 6 admitted)
25  Q   Did Mrs. Kane inform you as to how much her husband

Page 111

1       received in compensation for employment?
2   A   Yes. At one point she stated that Mr. Kane receives
3       $20,000 a month and that she received a 10,000-dollar
4       monthly allowance.
5   Q   From who?
6   A   She -- Mr. Kane received it from Security Aviation or
7       Avery & Associates, and she received it from him.
8   Q   Okay. Did you find any guns in the house?
9   A   Yes, we did.
10  Q   Tell the Court what you found.
11  A   Total of six various firearms, three of which were some
12      variation of an AR-15 assault rifle, two of which were
13      handguns.
14  Q   Okay. And as to the assault rifle types, they appear to
15      you to be your average assault rifle type, or were they
16      anything special done to them or what?
17  A   No. They -- they appeared to be not -- not off the shelf.
18      They -- they had modifications of various types. One, for
19      example, had a compensator added to it after -- after the
20      factory. The others, I'm not an expert in that, but they
21      appeared to be -- have special sights and -- and --
22      added items to them.
23  Q   Okay. Now, as to the pistols, was three something unique
24      about one of the pistols you found?
25  A   Correct. One of the pistols was a -- an H & K USP .40

Page 112

1       caliber, and it had a threaded barrel.
2   Q   Okay, what does that signify?
3   A   Generally a threaded barrel on a pistol or rifle indicates
4       something needs to be attached to the end of the barrel,
5       such as a silencer.
6   Q   Did you find a silencer in the residence?
7   A   Yes, we found a silencer.
8   Q   And could you describe the silencer, what you found, what
9       it looked like?
10  A   Sure. It was black, a cylinder, threaded to receive the
11      threaded barrel of a firearm. It had markings on the
12      side, I believe said United States Government on the side
13      or something like law enforcement only, and it had -- it
14      was -- it was .45 caliber, so it was threaded for a .45
15      caliber.
16  Q   Okay. Did you try to match up the silencer or somebody on
17      the search team match up the silencer with one of the guns
18      that -- one of the pistols that was found?
19  A   Yes, we tried to attach the silencer to the USP .40
20      caliber and it would loosely attach, but would not
21      properly attach.
22  Q   So the silencer was for a .45 caliber.
23  A   Correct.
24  Q   Did you find any evidence of a .45 caliber for Mr. Kane in
25      the residence?

Page 113

1   A   Yes, we found a bill of sale in Mr. Kane's name for an
2       H & K USP .45 caliber.
3   Q   That wasn't found during the residence, right? Or.....
4   A   No.
5   Q   .....during the search of the residence?
6   A   No.
7       MR. SPAAN: One moment, Judge, if we could.
8   Q   Let me move you back to Exhibit No. 5. I went over two
9       items that I need to discuss briefly. The first page of
10      Exhibit 5 which has the fugitive recovery agent concealed
11      weapons permit, you see that?
12  A   Yes.
13  Q   On the bottom of that page there are two other pieces of
14      identification with pictures and the name of Robert F.
15      Kane on there. Do you see those?
16  A   Correct.
17  Q   Your copy might be a little better than mine. If you look
18      on the left-hand side it says Washington, D.C. ID?
19  A   Yes, there's a Washington -- what appears to be
20      Washington, D.C. identification card with a Washington,
21      D.C. address and the name of Robert Kane, with Robert
22      Kane's photograph. To the left of that is.....
23  Q   And that one.....
24  A   .....an inter--.....
25  Q   That one appears to be valid, correct? Isn't there -- is

29 (Pages 110 to 113)

EXHIBIT # _____C_____
Page # ___29___ of ___62___

U.S.A. v. KANE
CASE NO. 3:06-mj-00011-JDR

TRANSCRIPT OF PROCEEDINGS
FEBRUARY 7 & 8, 2006

Page 114

1  there an expiration date on that?
2  A    Expiration date is August 21st of 2006.
3  Q    Okay. Let's flip that exhibit over. That's Exhibit
4  No. 5. Left-hand side is an international driver's
5  license. Is that.....
6  A    It appears to be an international driver's license, yes.
7  Q    Okay. And there's an address provided for what state?
8  A    Looks like Christmas Valley, Oregon.
9  MR. SKROCKI: Okay. If I haven't already done so, Your
10 Honor, move for the admission of all exhibits, numbers 3 through
11 12.
12 MR. SPAAN: Just so we discussed them all, we have no
13 objection, Your Honor.
14 THE COURT: Exhibit -- we have in evidence 3, 5, 7, 9, 10,
15 8, 6, 11, and there's discussion about 5. Do you want that?
16 MR. SKROCKI: I would.
17 THE COURT: Any objection to 5?
18 MR. SPAAN: Let me check 5 is not already in. No, no
19 objection, Your Honor.
20 THE COURT: Does the clerk have any different.....
21 THE CLERK: (Indiscernible).
22 THE COURT: All right.
23 MR. SKROCKI: That's all we have. Thank you.
24 THE COURT: Cross-examination.
25 MR. SPAAN: Thank you, Your Honor.

Page 115

1  AGENT SHAWN CLAPP
2  testified as follows on:
3  CROSS-EXAMINATION
4  BY MR. SPAAN:
5  Q    Agent Clapp, I'm Mike Spaan. Good afternoon. Why don't
6  we start with the silencer. Did you observe this
7  silencer?
8  A    Yes.
9  Q    Okay. How much did it weigh?
10 A    I don't know how much it weighed.
11 Q    Are you familiar with silencers?
12 A    No.
13 Q    Did you observe whether there were chambers in this?
14 A    No, I did not.
15 Q    I see. Did you check to see perhaps whether this item was
16 a prop for a BB gun?
17 A    I turned it over to Alcohol, Tobacco & Firearms agent, who
18 checked on the contents of it and the usability of it.
19 Q    And have you received a report from them?
20 A    He reported back that it was a -- it was an illegal
21 silencer.
22 Q    Designed to silence a handgun?
23 A    A .45 caliber handgun.
24 MR. SPAAN: Your Honor, we'd ask that this silencer be
25 produced, because I maintain to the Court it's going to be made

Page 116

1  out of sheet metal, there's no baffles, it's not a silencer
2  designed for a handgun, and this is obviously something Your
3  Honor is going to take into consideration.
4  MR. SKROCKI: Your Honor, we don't have the silencer here,
5  so -- it's -- again, it goes to weight.
6  THE COURT: We'll not delay the proceeding for the
7  silencer.
8  Q    Okay. Agent, I'd like to now go over some of these
9  exhibits that you've discussed, and I'm going to try and
10 get them in the order that you discussed it, okay? First
11 of all, we had.....
12 MR. SPAAN: Exhibit 1 was never put in, am I correct,
13 Mr. Skrocki?
14 MR. SKROCKI: Right, that.....
15 MR. SPAAN: Okay.
16 MR. SKROCKI: .....witness hasn't been (indiscernible).
17 Q    Okay. The first exhibit you talked about was Exhibit 3;
18 is that correct? Do you have that in front of you?
19 A    That's correct.
20 Q    Okay. Now, this is a picture of Mr. Kane in what you
21 referred to as a Philippine Auxiliary Coast Guard uniform.
22 A    Correct.
23 Q    Correct. Do you know whether or not Mr. Kane was in the
24 Philippine Coast Guard Auxiliary?
25 A    No, I do not.

Page 117

1  Q    Okay. If he was, then he'd have a uniform on, correct?
2  A    He would have a uniform.
3  Q    Okay. Now, you've also testified I believe in number 2
4  that some of these medals were United States medals,
5  correct?
6  A    It appears that all of these medals are United States
7  medals.
8  Q    Do you know whether he was authorized by the Filipino
9  Coast Guard Auxiliary to wear these medals?
10 A    Based on my experience with the Filipino military, they do
11 not issue the same medals we do.
12 Q    What is your experience with the coast guard auxiliary for
13 the Republic of the Philippines?
14 A    Very limited.
15 Q    How limited? None?
16 A    No, occasional contact. Nothing -- nothing on an ongoing
17 basis.
18 Q    Did you know that Mr. Kane's father-in-law was a bigwig in
19 the Filipino Coast Guard?
20 A    No.
21 Q    Okay. And did you know that when Mr. Kane was in the
22 Philippines he was working for United States intelligent
23 agencies; did his wife relay that to you during the 10
24 hours you talked to here?
25 A    His wife told me that, yes.

30 (Pages 114 to 117)

EXHIBIT # _____C____
Page # __30__ of __62__

U.S.A. v. KANE
CASE NO. 3:06-mj-00011-JDR

TRANSCRIPT OF PROCEEDINGS
FEBRUARY 7 & 8, 2006

Page 118

1  Q   Okay. And have you done anything to verify whether or not
2      that's true?
3  A   I have not personally, no.
4  Q   Okay. Do you have any knowledge whether or not Mr. Kane
5      was authorized by somebody in the United States
6      intelligence to wear these as part of a job he was on?
7  A   I have no knowledge of it.
8  Q   Okay. But Mrs. Kane relayed to you that he was working
9      for United States security or intelligence agencies,
10     right?
11 A   She told me he was working for the FBI.
12 Q   Okay. When he was in the Philippines.
13 A   Correct.
14 Q   Okay. And you have not confirmed that or not confirmed
15     it. We don't know. That's what she said.
16 A   I have not personally confirmed that. I've been told that
17     it's not correct.
18 Q   Okay, and who told you that?
19     MR. SKROCKI: Objection. He's not entitled to know where
20 the information -- the name of the witness that provided him the
21 information.
22     THE COURT: Well, you don't have to reveal the person's
23 name, but the source, I think, generally.
24     MR. SKROCKI: So the agency, in other words?
25     THE COURT: Yes.

Page 119

1  Q   The agency, then, that told you that.
2  A   I checked with -- actually, I had been told by other
3      agents of the FBI that that is not correct, yes.
4  Q   Okay, have you talked to Mr. Bob Coffin (ph) in Tampa,
5      Florida regarding whether or not that is correct?
6      MR. SKROCKI: Objection, Your Honor, we're too far afield.
7      THE COURT: Sustained.
8  Q   Do you know, did Mrs. Kane tell you, sir, who Mr. Kane's
9      control agent was for the FBI when he was in the
10     Philippines?
11     MR. SKROCKI: Your Honor, this is going towards an
12 investigation of whether Mr. Kane's an active agent or believes
13 to be an agent or is acting under the color of pretending to be
14 an agent. The information we have right here is he's an agent
15 for pretty much everybody from the UN down to MI6.
16     MR. SPAAN: Well, we haven't established that yet, Your
17 Honor. We're talking about the FBI.
18     THE COURT: I'll allow the question as -- the question is
19 whether Mrs. Kane so advised.
20 Q   Right.
21 A   Mrs. Kane told me who she believed was Robert Kane's
22     handler for the FBI, yes.
23 Q   And who did she tell you that was?
24 A   She said the name Bob Coffin.
25 Q   Did you phone Agent Coffin to confirm this or to have --

Page 120

1      be told it's not true?
2  A   I did not.
3  Q   Okay. I believe the next items we looked at, agent, were
4      numbers 3 and 4. Excuse me. And 3 was the picture we
5      discussed. Document number 4 is the auxiliary
6      identification for Mr. Kane from the Philippine Coast
7      Guard; is that correct?
8  A   Correct.
9  Q   And do you have any reason to believe that's not a
10     legitimate document?
11 A   No.
12 Q   Okay. And the other description, you have no reason to
13     believe that the item below it is anything but a
14     legitimate document?
15 A   No, I do not.
16 Q   Now, on the news article attached to what's been now
17     admitted as Government's 4 there seems to be a picture of
18     Mr. Kane, correct?
19 A   Yes, that's correct.
20 Q   And it says U. S. Navy Commodore Robert Kane, left,
21     plays [sic] a courtesy call to regional police director,
22     blah, blah, blah. Kane was part of a program teaching
23     antiterrorist techniques, which also donated 20
24     bulletproof vests. We have a photo of it, one of which is
25     shown here. Do you have any reason to believe this is not

Page 121

1      a legitimate newspaper article that Mr. Kane appeared in?
2  A   It appears to be a legitimate newspaper article, yes.
3  Q   And Mr. Kane, you have no knowledge that Mr. Kane wrote
4      this article.
5  A   No.
6  Q   And so if he's identified as a U. S. Navy commodore, that
7      was by the people who did the paper, correct?
8  A   I assume so, yes.
9  Q   Right. Now I'm going to exhibit -- that was -- I'm sorry.
10     That was 4 -- number 5, and I'm fumbling around, agent,
11     because I -- these things are kind of out of order, okay?
12     What we have is a fugitive recovery agent. Do you know
13     what a fugitive recovery agent is?
14 A   Yes, I do.
15 Q   And that'd be like a bail skip guy, is that -- am I
16     thinking of the right thing?
17 A   Correct.
18 Q   Okay. And this was in Nevada, right? I'm looking at the
19     top left.
20 A   Yes, it looks like it was from Nevada.
21 Q   Okay, and it was issued August 1st, 2001.
22 A   Correct.
23 Q   Okay, and then there's a badge below that that makes him a
24     pri-- a fugitive recovery, correct?
25 A   No, this is a -- a concealed weapons permit badge.

31 (Pages 118 to 121)

MIDNIGHT SUN COURT REPORTERS
(907) 258-7100

EXHIBIT #_____C_____
Page #___31___ of ___62___

U.S.A. v. KANE
CASE NO. 3:06-mj-00011-JDR

TRANSCRIPT OF PROCEEDINGS
FEBRUARY 7 & 8, 2006

Page 122

1  Q   Okay, and is there -- do you know whether or not the -- he
2      was, in fact, a fugitive recovery agent in Nevada around
3      2001?
4  A   His wife made some reference to that.  She had difficulty
5      describing it, but she said something along those lines,
6      yes.
7  Q   Okay.  And do you know whether or not Mr. Kane is
8      authorized in Nevada or anyplace else to carry a concealed
9      weapon?
10 A   I do not, no.
11 Q   And talking about weapons, do you know any reason that
12     Mr. Kane could not have lawful weapons in his house?
13 A   No.
14 Q   And as far as the assault weapons that you described as
15     somewhat modified in your estima-- not in your
16     estimation -- do you have any evidence that they're
17     illegally modified?
18 A   I do not, no.
19 Q   Okay.  And the fact that he had them in his house, you
20     know of no restriction on that, correct?
21 A   Other than the silencer, no.
22 Q   Well, and, again, we need the silencer because that's a
23     big-ticket issue and we want to see it if we can at some
24     point.....
25     MR. SKROCKI:  Is that a.....

Page 123

1  Q   .....because.....
2      MR. SKROCKI:  .....question or is that a statement?
3      MR. SPAAN:  No.
4      THE COURT:  Seems like a statement.
5  Q   Did Mrs. [sic] Kane's wife ever tell you that said
6      silencer was a prop for a BB gun; did she tell you that?
7  A   She actually told me that she wasn't aware of any firearms
8      in the house other than one handgun.
9  Q   Do you remember -- or do you know, sir, where they found
10     the silencer?
11 A   Yes, it was found -- difficult to describe the area.  It's
12     sort of a catwalk-type area above the stairs and the
13     stairwell adjacent to the master bedroom.....
14 Q   And.....
15 A   .....in an armoire.
16 Q   And -- okay, and what was it stored with?
17 A   Several firearms.
18 Q   Okay.  And what was -- did you find any air rifles or BB
19     guns in Mr. Kane's house?
20 A   Not in that area.  The garage we did, yes.
21 Q   Okay, and do you remember what brand they were?
22 A   No.
23 Q   And did you check to see whether or not the silencer would
24     fit onto the air rifle or the air pistol?
25 A   No.

Page 124

1  Q   Okay.  Now, the fact that you don't know why Mr. Kane
2      would have a Washington, D.C. driver's li-- or -- correct?
3  A   Appears to be an ID card, and I do not know.
4  Q   Okay.  So -- okay.  Nothing that you know for the ID card
5      that would be illegal about that; is that correct?
6  A   I'm not familiar with the local laws in Washington, D.C.
7      about that, no.
8  Q   So the answer would be you're not aware of anything wrong
9      with him.....
10 A   No.
11 Q   .....having this document.  Okay.  The international
12     driver's license, assuming he lived in Oregon at the time
13     this was issued, there's nothing unusual about that, is
14     there?
15 A   Other than I'm not sure who issues this.  It doesn't
16     appear to be anything I've ever seen before.
17 Q   Are you familiar with international driver's licenses?
18 A   Somewhat, yes.
19 Q   And you're telling me you don't recognize this?
20 A   There are many, many kinds, and no real official agency
21     that issues them, no real controlling authority.
22 Q   So you.....
23 A   You can just buy them.
24 Q   .....don't know if this is -- there's anything wrong with
25     this.

Page 125

1  A   No.
2  Q   Okay.
3  A   It'd be just like any other.....
4  Q   Okay.  Let's see.  Again, on 5 in the far right could you
5      identify that for me again?
6  A   The top far right?
7  Q   Yes, sir.
8  A   It appears to be some sort of identification from the
9      Philippine National Police Commission.
10 Q   Okay.  Identifying Mr. Campe [sic] as who?  My eyes are
11     because of advanced age a little weaker than yours, sir,
12     so if you could help me with this?
13 A   Sure.  There's a photograph of Mr. Kane.
14 Q   Okay.
15 A   It says -- basically has -- it says patrol order, has a
16     number, says to Commander Robert Frasier Kane, task force
17     Tolisto (ph) seven, destination, purpose confidential,
18     duration, has a date on it.  Basically it says authorized
19     to wear civilian attire and to carry firearms.
20 Q   Okay.  And his wife said he was employed in the
21     Philippines with the intelligence community, correct?  Or
22     the FBI, I believe was your testimony.
23 A   She told me that he was doing work in the Philippines for
24     the FBI.
25 Q   Is there any reason you have to suspect that this is not a

32 (Pages 122 to 125)

EXHIBIT # _____ C _____
Page # _____ 32 _____ of _____ 62 _____

U.S.A. v. KANE
CASE NO. 3:06-mj-00011-JDR

TRANSCRIPT OF PROCEEDINGS
FEBRUARY 7 & 8, 2006

---

Page 126

1  legitimate document?
2  A   No.
3  Q   No. Let's see. The next one I believe, agent, that we
4      talked about was Exhibit No. 9. Let me dig for that.
5      And, again, these are the bail enforcement agent
6      credentials on the right, correct?
7  A   Correct, another set of bail enforcement.....
8  Q   Okay.
9  A   .....agent credentials.
10 Q   And you're familiar that bounty hunters or bail guys or
11     something would have these documents, correct?
12 A   Yes, they would.
13 Q   Okay. And no matter how Mr. Skrocki described the seal,
14     it doesn't say federal marshal. Both of them go fugitive
15     recovery agent for one, right? Bail enforcement agent for
16     the second. Am I correct?
17 A   Yes.
18 Q   Okay. And are you familiar with any law in Nevada that
19     would prohibit the wearing of these to identify oneself as
20     a bail enforcement.....
21 A   No.
22 Q   .....agent?
23 A   If properly used, no.
24 Q   Okay. The next page is we have the fugitive recovery agent
25     on the left. No different information about that. Then

---

Page 127

1      on the right we have a Nevada enforcement. And do you
2      know how Mr. Kane came not possession of this?
3  A   No, I don't.
4  Q   Okay. And would there have been anything wrong with
5      Mr. Kane possessing this item if he was giving it to -- by
6      a friend to collect it?
7  A   I -- I'm not familiar with Nevada law on that, so I
8      wouldn't know.
9  Q   Okay. Let's see. Number 10, we've discussed, was a
10     passport for Mr. Kane's wife, correct? It's the two-page
11     document.
12 A   Yes, that's correct.
13 Q   Okay. And when did this passport expire, if you know?
14 A   Looks like September 13th of 2005.
15 Q   Okay. So this passport is no longer any good, right?
16 A   For travel, no. For identification, yes.
17 Q   You could use an out-of-date passport for identification;
18     is that your testimony?
19 A   That's correct.
20 Q   Okay. And do you -- did you ask Mrs. Kane how she got
21     this or why she had it?
22 A   Yes, we did, actually.
23 Q   And did she tell you that she -- they were going on a
24     Knights of Malta mission; did she tell you that?
25 A   She told me she didn't know why she had it.

---

Page 128

1  Q   Is there her on -- in the picture, right?
2  A   Yes.
3  Q   Okay. And you don't know why she has it.
4  A   I do not know why she had it.
5  Q   Okay. You know it's out of date for travel, but we don't
6      know why she has it.
7  A   Correct.
8  Q   Okay. The cash you found, you said some of them were in
9      different envelopes?
10 A   There were three total envelopes, yes.
11 Q   Okay. And did one of those envelopes, if you remember,
12     say Security Aviation on it?
13 A   I believe one did, yes.
14 Q   And how much cash was in that envelope?
15 A   I would have to refer to the inventory to -- to recall
16     specifically.
17 Q   Please refer.
18 A   I don't have a copy of the inventory.
19     MR. SPAAN: Okay, I'm sorry, I got a copy of the
20 inventory. If I may approach, Your Honor?
21     THE COURT: You may.
22 Q   Would be this one, this one here.
23 A   It doesn't state on this inventory which one had that
24     writing on the outside. I believe it was the one with the
25     majority of the cash.

---

Page 129

1  Q   And did you inquire why it took -- so it would be your
2      testimony that the envelope with the most cash said
3      Security Aviation, correct?
4  A   That's my recollection.
5  Q   Okay. Did you check to see whether or not pilots for
6      Security Aviation had any need of cash in flying to
7      foreign countries?
8  A   I did not check that, no.
9  Q   Okay. Did you check to see whether or not this money was
10     signed out to Mr. Kane?
11 A   No.
12 Q   Okay. But you'd have no reason to not assume it was
13     Security Aviation's money, correct?
14 A   That's correct.
15 Q   And there's nothing wrong with having cash, correct?
16 A   No.
17 Q   Okay. Number 8 is a multifaceted exhibit. We have two
18     passports from Mr. Kane, right?
19 A   Yes.
20 Q   Okay, one expired, one current.
21 A   That's correct.
22 Q   And those are now in the custody of federal law
23     enforcement, correct?
24 A   That's correct.
25 Q   Okay. Then we have sat. phones, and what is remarkable

---

33 (Pages 126 to 129)

EXHIBIT # _____ C _____
Page # ___33___ of ___62___

U.S.A. v. KANE                                                      TRANSCRIPT OF PROCEEDINGS
CASE NO. 3:06-mj-00011-JDR                                              FEBRUARY 7 & 8, 2006

Page 130

1    about these numbers in the top left, second page?
2  A   Well, they appear to be international phone numbers, but
3    many satellite phones are.
4  Q   Okay. Do you have any information on who these people are
5    or why there'd be anything untoward about this card?
6  A   I -- I do not personally know, no.
7  Q   Okay. Now, on -- we go to the right and we have the
8    counsel for the Philippines, correct?
9  A   That's correct.
10 Q   Okay. What -- is there anything unusual about this since
11   Mr. Kane was in the Philippines?
12 A   No.
13 Q   All right. Then we have Sergeant Smith for the
14   Municipality of Anchorage, the police department, correct?
15 A   That is correct.
16 Q   Right, and you know that Mr. Smith and Mr. Kane were
17   childhood friends, correct?
18 A   No, I don't know that.
19 Q   Okay. Not childhood friends, but long, old-time guys. We
20   go to the right we have a recovery agent card again,
21   right?
22 A   Yes.
23 Q   Then we have the junior chamber, then we have the HSBC,
24   okay. Do you know whether or not these two cards on the
25   bottom are active?

Page 131

1  A   I do not know that, no.
2  Q   Okay. We then have some other credit cards on the third
3    page, correct?
4  A   Yes.
5  Q   And do we -- and I assume on the one on the middle right
6    has never been activated, right?
7  A   It -- the sticker wasn't removed.
8  Q   Okay. It was -- that's fair. It was either activated and
9    the sticker on it or it wasn't. Are those -- is this like a
10   bank card or is it a credit card?
11 A   The -- the one that has -- doesn't appear to be activated
12   yet?
13 Q   Right.
14 A   It has a MasterCard logo on it.
15 Q   Uh-huh.
16 A   I couldn't tell you exactly what it is. I -- I haven't
17   ever seen this card before.
18 Q   Okay. Now, the card on top of that expired in 2003,
19   correct?
20 A   Yes.
21 Q   And what about the card on the top left? When is that
22   expiring?
23 A   Looks like January of 2006.
24 Q   Okay, so that's expired. What about the one below that?
25 A   That one was -- it's hard to read, but appears to be

Page 132

1    August of '05.
2  Q   Okay. So most of these cards are expired, correct?
3  A   The ones here on the back, yes.
4  Q   Right. Okay. I believe the next exhibit we discussed was
5    Exhibit 12, which is the person that Mr. Kane works for,
6    it's their bank wiring information; is that correct?
7  A   Appears to, yes.
8  Q   Right. And is there any reason to consider it suspicious
9    that Mr. Kane who works with Security Aviation would have
10   this information in his car?
11 A   Not that I know of.
12 Q   Okay. The next was a Western Union -- number 11, agent.
13   And this was money wired to Mr. Kane, correct? Was that
14   your testimony?
15 A   It appears like it's wire -- receipts for wire transfers
16   wired to Mr. Kane, yes.
17 Q   And can you read the dates on these?
18 A   Not very well, actually.
19 Q   Okay. So do you know how current they are? I can't read
20   them at all, so I.....
21 A   Some of them are from 2003, actually, I can read, and a
22   few I can't read, but it looks like the majority are from
23   2003.
24 Q   Okay. So that's what, three years ago, 2-1/2 years ago,
25   right?

Page 133

1  A   Some of them are from late December/October, so.....
2  Q   Let's not quibble, but, I mean, they're 2003, they're at
3    least.....
4  A   Yes, 2003 time frame.
5  Q   .....a year or two old. Okay. Now, there's nothing
6    illegal about receiving money through Western Union,
7    correct?
8  A   No.
9  Q   Okay. Number 6 was this -- starts out top secret, okay?
10 A   Correct.
11 Q   Got that document? This first page, do you know whether
12   this resembles a top secret deal from the 1940s that they
13   used to use in the day?
14 A   It could.
15 Q   Okay. In any event, your testimony was this wasn't in
16   red, it was in -- what color was it, again?
17 A   It is orange, yes.
18 Q   Okay. And is there anything illegal about somebody
19   putting this on their collection of stuff?
20 A   No.
21 Q   Okay. Now, these other items were -- you said were good-
22   quality folders; was that right?
23 A   They were yellow manila folders.....
24 Q   Okay.
25 A   .....with this printed on them in -- it looked like inkjet

34 (Pages 130 to 133)

EXHIBIT # _____ C _____
Page # ___ 34 ___ of ___ 62 ___

U.S.A. v. KANE
CASE NO. 3:06-mj-00011-JDR

TRANSCRIPT OF PROCEEDINGS
FEBRUARY 7 & 8, 2006

---

Page 134

1    printing.
2  Q  Okay, but a pretty professional job?
3  A  I would say good quality. Professional, I wouldn't.....
4  Q  Okay, but a good-quality job.
5  A  Yes.
6  Q  Were there anything in these folders?
7  A  Some of them had some handwritten notes, some had some
8     typed doc-- there were some documents in some of them.
9     Many of them were empty.  Some had some documents in them.
10 Q  Okay.  Did you talk to Mrs. Kane about these?
11 A  Yes.
12 Q  And what did she tell you?
13 A  She stated that that was the bag that Robert Kane usually
14    took to work and she didn't know what was in there or what
15    it was for.
16 Q  Okay, so she had no information, at least that she related
17    to you, regarding these documents.
18 A  Correct.
19 Q  Okay.  Now, would -- was it possible -- well, you wouldn't
20    know, but is there anything illegal about having these
21    covers that you're aware of?
22 A  Not that I'm aware of.
23 Q  Okay, and if one wants to display them on the wall,
24    there'd be nothing wrong with that, would there?
25 A  No.

---

Page 135

1  Q  That you're aware of.
2  A  No.
3  Q  Okay.  Number 7 is some weapons -- or medals, I'm sorry.
4     I'm out of the probable cause hearing now.  Medals, right?
5  A  That's correct.
6  Q  Right, and you said that Mr. Kane wasn't in the military,
7     so obviously he didn't get them through the military,
8     right?
9  A  That's what I said, yes.
10 Q  And is there any law against collecting these things?
11 A  No.
12 Q  Okay.  And you could get these -- if you can get a rocket
13    pod on eBay, do you think you could get these?
14 A  You can get these over the Internet, yes.
15    MR. SPAAN:  Okay.  I think that is the documents.  We've
16 talked about the guns, and, Your Honor, again, I think if the
17 silencer is going to be a determinate factor, we need to get the
18 silencer here.
19    THE COURT:  I understand your comment.  Any redirect by
20 the Government?
21    MR. SKROCKI:  (Indiscernible).
22    THE COURT:  Let me inquire about the matter that was set
23 for 3:30, Christianson case.  Counsel are here?
24    UNIDENTIFIED SPEAKER:  I'm here.
25    THE COURT:  And do you intend to go forward with the

---

Page 136

1  preliminary hearing?
2     UNIDENTIFIED SPEAKER:  Yes.
3     THE COURT:  All right.  Thank you.  I'll announce in just
4  a moment how we're going to proceed.
5     MR. SKROCKI:  No further questions.
6     THE COURT:  You may step down.
7     (Witness excused)
8     THE COURT:  I'm going to have to stop this hearing and
9  resume this at a different time.  I have other matters that have
10 equal standing to go forward.  I can probably pick up on this
11 tomorrow.
12    MR. SPAAN:  Your Honor, Mr. Kane's in custody.  I don't
13 believe he should be, so the earliest possible opportunity is
14 what we would request.
15    THE COURT:  Any idea how long your presentation will take?
16    MR. SPAAN:  Your Honor, I have at least three proposed
17 third-party custodians should Your Honor require that, and it
18 shouldn't take that long.
19    MR. SKROCKI:  We have one more short witness.
20    THE COURT:  All right, I will set it at 2:00 o'clock,
21 then.  Rather than piecemeal it, from 2:00, and we'll go until
22 it finishes.
23    MR. SPAAN:  Thank you, Your Honor.
24    THE COURT:  All right.  I did rule on the preliminary
25 hearing, so the temporary detention order is continued until the

---

Page 137

1  hearing's completed tomorrow.  We will take up the U. S. v.
2  Ronald Christianson matter next.
3     MR. McKAY:  Your Honor?  Before you leave the record in
4  this case, may I be heard for a brief moment?
5     THE COURT:  Yes.
6     MR. McKAY:  Thank you, Your Honor.  My name's John McKay.
7  I'm here on behalf of the Anchorage Daily News and Channel 2,
8  and I appreciate the fact that there wasn't any problem this
9  afternoon getting the hearing, but until shortly before the
10 hearing the clerk's office was unable to or unwilling to
11 acknowledge that this case even exists, that there was a file, a
12 case number.  Nothing could be looked up.  They couldn't comment
13 on whether there was a file or not.  Your office couldn't
14 comment on whether there was a hearing scheduled; it was not on
15 the calendar for today.  I believe this is likely to be a
16 product of some sort of mistake, and so.....
17    THE COURT:  It does appear to be an oversight.  The
18 Government did not move to formally unseal the documentation at
19 the last hearing, and I think the preliminary hearing, let me
20 ask counsel, that was not under seal, right?  So it was just an
21 oversight.  This was not meant to be a sealed proceeding.
22    MR. McKAY:  Yes, Your Honor, it wasn't, but everybody was
23 under orders not to even comment that it existed.
24    THE COURT:  Well, it didn't come to my attention to rule
25 on it, and so.....

---

35 (Pages 134 to 137)

EXHIBIT #_____ C_____
Page #___35___ of___62___

U.S.A. v. KANE
CASE NO. 3:06-mj-00011-JDR

TRANSCRIPT OF PROCEEDINGS
FEBRUARY 7 & 8, 2006

---

Page 138

1    MR. McKAY:  Your Honor, I tried to bring it to.....
2    THE COURT:  .....hopefully it won't happen again.
3    MR. McKAY:  .....I raised -- well, and so if you -- all
4  I'm asking at this point, Your Honor, is if we -- if I could ask
5  your indulgence in communicating both with your staff and with
6  the clerk's office, that there isn't any -- you know, obviously,
7  if something is filed which appropriately should be filed under
8  seal or closed, it would be taken in the routine course of
9  things, and otherwise that this should be treated as an ordinary
10  case for purposes of having a file that the public can see.
11    THE COURT:  I understand.  I don't think there's anything
12  different we need to do.  Hopefully it won't repeat itself.
13    MR. McKAY:  All right, thank you, Your Honor.
14    THE COURT:  All right.  And let me just take this
15  opportunity to caution counsel here and any high-profile case.
16  You might want to reread the local rules about discussing
17  matters with the press and the canons of ethics.  I'm not going
18  to be specific about what you can say and don't say, but keep in
19  mind that eventually down the road if the case proceeds that far
20  there'll have to be an untainted jury obtained, and so keep in
21  mind both sides are entitled to a fair trial.
22    We'll take a brief recess and then continue the calendar.
23    MR. SPAAN:  Your Honor, can I request the silencer at 2:00
24  o'clock tomorrow, please?
25    THE COURT:  We'll talk about it.

---

Page 139

1    MR. SPAAN:  Well, could the Court order them to
2  produce.....
3    THE COURT:  See if you.....
4    MR. SPAAN:  .....the silencer?
5    THE COURT:  .....can come to some agreement about --
6  stipulation of fact as to why you want it here.  I don't know
7  whether they're going to analyze it for fingerprints or for
8  something else, it might be in the lab.  I don't know.  I'm not
9  going to order it out of the clear, but see if you can come to
10  some agreement for what you would hope for it to show, and maybe
11  there's not a dispute of that fact, the size of it or whether it
12  would fit something or -- otherwise, it's not a high priority
13  item in the ruling of bail.  It's just one fact in the
14  presentation.
15    THE CLERK:  All rise.  Court stands in brief recess.
16    (Court recessed)
17  3:43:15
18  /
19  /
20  /
21  /
22  /
23  /
24  /
25  /

---

Page 140

1
2
3            DETENTION/BAIL HEARING, CONTINUED
4          BEFORE THE HONORABLE JOHN D. ROBERTS
5              United States Magistrate Judge
6
7                    Anchorage, Alaska
8                    February 8, 2006
9                    2:30 o'clock p.m.
10
11  APPEARANCES:
12
13  FOR THE PLAINTIFF:     U. S. DEPARTMENT OF JUSTICE
14                         OFFICE OF THE U. S. ATTORNEY
15                         BY:  STEVEN E. SKROCKI, ESQ.
16                         ASSISTANT U. S. ATTORNEY
17                         222 W. Seventh Ave., #9, Room 253
                           Anchorage, Alaska 99513
18
19  FOR THE DEFENDANT:    PATTON BOGGS LLP
                          BY:  MICHAEL R. SPAAN, ESQ.
20                        MATTHEW BLOCK, ESQ.
                          601 West Fifth Avenue, Suite 700
21                        Anchorage, Alaska 99501
22
23
24            MIDNIGHT SUN COURT REPORTERS
25                 (907) 258-7100              140

---

Page 141

1            P R O C E E D I N G S
2  2:30:09
3    THE CLERK:  All rise.  His Honor the Court for the United
4  States District for the District of Alaska is now in session,
5  the Honorable John D. Roberts presiding.  Please be seated.
6    THE COURT:  This is a hearing in U. S. v. Robert Kane,
7  continuation of the detention hearing we had yesterday.
8  Defendant and counsel are present.  Does the Government have any
9  additional evidence to present?
10    MR. SKROCKI:  We do, Your Honor, and call Jolene
11  Bronkhorst to the stand, please.
12    THE CLERK:  Please raise your right hand.
13    (Oath administered)
14    AGENT BRONKHURST:  Yes.
15    THE CLERK:  Thank you.  Please be seated.
16            AGENT JOLENE BRONKHORST
17  called as a witness on behalf of the plaintiff, testified as
18  follows on:
19            DIRECT EXAMINATION
20    THE CLERK:  Please be sure to speak into the microphone,
21  and please state your full name, spelling your last name.
22  A    Jolene Bronkhorst, B-r-o-n-k-h-o-r-s-t.
23    THE CLERK:  And your first name?
24  A    J-o-l-e-n-e.
25    THE CLERK:  Thank you.

---

36 (Pages 138 to 141)

EXHIBIT #_____C_____
Page #____36____ of ___62___

U.S.A. v. KANE
CASE NO. 3:06-mj-00011-JDR

TRANSCRIPT OF PROCEEDINGS
FEBRUARY 7 & 8, 2006

Page 142

1   THE COURT: Yes.
2   MR. SKROCKI: Thank you, sir.
3   BY MR. SKROCKI:
4   Q   Agent Bronkhorst, you work for the FBI?
5   A   Yes.
6   Q   Were you involved in the search of 3230 C Street last week
7       pursuant to a search warrant?
8   A   Yes, I was.
9   Q   How long have you been with the FBI?
10  A   Approximately two years.
11  Q   And in what capacity, what do you do for them?
12  A   I'm an agent for the FBI.
13  Q   Any specialized skills or area of practice?
14  A   I primarily work white collar, public corruption, bank
15      fraud-type -- type things.
16  Q   In reference to the search on the C Street did you have a
17      specific designation?
18  A   Yes. I'm on the evidence response team. I was a team
19      leader for that site.
20  Q   And your responsibilities were to do what?
21  A   Oversee the search, the search personnel, the search
22      areas, the recording of evidence.
23  Q   And you brought some documents with you today from the
24      search at C Street, correct?
25  A   Yes.

Page 143

1   Q   Okay. If I could have you turn your attention to the
2       first one, that's Exhibit No. 1 after you've marked it?
3   A   Uh-huh.
4   Q   You were tasked in part to look for some evidence
5       information concerning Robert Kane, correct?
6   A   Yes.
7   Q   Could you describe to the Court what you found in terms of
8       the office space or (indiscernible) for Mr. Kane in the
9       C Street resid-- or C Street building?
10  A   Sure. It's a two-story building, and we identified two
11      office space -- spaces as Mr. Kane's offices. Both were
12      on the second floor. One office was on the southeast of
13      the building, and the other office, the smaller office,
14      was on the northwest corner of the building.
15  Q   As to the first office building, could you describe how it
16      looked on the inside? Was it -- in what kind of form was
17      it kept?
18  A   Sure. It was a professional looking office. There was a
19      desk, rug, furniture, couch, chairs and TV.
20  Q   Okay. Anything on the outside denoting who was the
21      occupant?
22  A   Yes. On the door there was a nameplate that said
23      commander.
24  Q   As to that room did you find Exhibit 1 in that area?
25  A   Yes.

Page 144

1   Q   And what is that?
2   A   Exhibit 1, these are a series of business cards, as well
3       as an HSBC.....
4   MR. SPAAN: I'm.....
5   A   .....banking card.
6   MR. SPAAN: I'm sorry.....
7   MR. SKROCKI: (Indiscernible).
8   MR. SPAAN: ......counsel.
9   A   Exhibit 1 is an application for certifi-- cert-- an
10      application for a certificate of permanent residence for
11      the Bahamas.
12  Q   It is -- it's blank, correct?
13  A   Correct.
14  Q   So there's no writing on it, but that was found in
15      Mr. Kane's office?
16  A   Yes, it was.
17  Q   And where was it located? Was it -- if you can describe
18      the location in reference to ease of access or hidden
19      where?
20  A   Sure. It was -- as you entered the office if you turned
21      to the right there were some tables, and it was underneath
22      one of the tables.
23  Q   Exhibit No. 2, please.
24  A   Exhibit No. 2, this is a series of business cards, as well
25      as a account number card for HSBC Bank of the Middle East.

Page 145

1   Q   Okay, we'll talk about that in a minute. Now, where did
2       you -- these cards, were these all together?
3   A   Yes.
4   Q   That are referenced on this one page, Exhibit 2?
5   A   Yes.
6   Q   Okay, so we have a bank card and some other -- that would
7       appear to be business cards.
8   A   Yes.
9   MR. SKROCKI: Okay. Move for the admission, Your Honor,
10  of Exhibit 1 and 2.
11  MR. SPAAN: No objection, Your Honor.
12  THE COURT: Admitted.
13      (Plaintiff's Exhibits 1 and 2
14      admitted)
15  Q   Agent Bronkhorst, on the upper left-hand side there's
16      a -- you mentioned a bank card, HSBC.
17  A   Correct.
18  Q   And there's some writing on it. Does it indicate where
19      the bank is?
20  A   HSBC Bank Middle East.
21  Q   Okay, and there's Mr. Kane's name, it says Robert Kane
22      there, correct?
23  A   Correct.
24  Q   There appears to be an account number below that.
25  A   Yes.

37 (Pages 142 to 145)

EXHIBIT #_____C_____
Page #____37____ of ____62____

U.S.A. v. KANE
CASE NO. 3:06-mj-00011-JDR

TRANSCRIPT OF PROCEEDINGS
FEBRUARY 7 & 8, 2006

Page 146

1    MR. SPAAN: I'm -- oh, I'm sorry, I've got it now, Your
2  Honor. Apologize.
3    THE COURT: Keep in.....
4  Q    And.....
5    THE COURT: .....mind the Court doesn't have copies of
6  these exhibits, so be sure and bring out what you want or
7  provide a copy to the Court.
8    MR. SKROCKI: Yes, sir. If I might approach, I'll show
9  you, Judge.
10 Q    There are some other business cards on that sheet as well,
11   correct?
12 A    Correct.
13 Q    Any of those deal with any business entities in the United
14   States?
15 A    No.
16 Q    What do they deal with?
17 A    They deal with businesses, various countries, the Ukraine,
18   United Arab Emirates I believe is on here, Petersburg,
19   other countries.
20 Q    Petersburg, Soviet Union?
21 A    Yes.
22 Q    Okay. And those were all attached together?
23 A    Yes.
24 Q    Okay. Now, there was a second office you mentioned.
25 A    Correct.

Page 147

1  Q    Correct, and were there indicators of Mr. Kane utilizing,
2    occupying or storing items in that office?
3  A    Yes.
4  Q    Can you tell the Court what that was?
5  A    In the second office, the smaller office on the northwest
6    corner of the building there were various emails, letters
7    and other documents that had Mr. Kane's name on it and
8    correspondence to and from him.
9  Q    So that'd be like -- that'd be the second office, and
10   what.....
11 A    Correct.
12 Q    .....was the state of this office compared to the first
13   one you talked about?
14 A    When you first worked in -- walked into the office,
15   different than the first, it was much smaller. Noticable
16   immediately when you walked in the door were a series
17   of -- of weapons in the office. There were four to five
18   AK-47-type weapons right inside the door leaning up
19   against the wall. Next to them was a stack
20   approximately -- boxes for 10 FN57 handguns, and then
21   laying on the floor directly in front of the window in the
22   office was a .50 caliber rifle.
23 Q    Single shot?
24 A    That I'm not sure.
25 Q    Okay. Anything on top of the rifle?

Page 148

1  A    A large scope on top.....
2  Q    Scope.
3  A    .....of the rifle.
4  Q    And next to that, was there something else next to that?
5  A    In the corner next to the sat. phone by the window was a
6    large sat. phone. The satellite phone had a large antenna
7    on it, approximately a foot and a half by a foot. It
8    was -- it was a large sat. phone antenna.
9  Q    You mentioned some AK-47 types.
10 A    Uh-huh.
11 Q    They apparently were inspected by ATF. They weren't full
12   auto, correct?
13 A    No, they were -- they were determined to be semiautomatic.
14 Q    Okay, nothing illegal about having those, right?
15 A    No.
16 Q    Were they secured in any fashion, do you recall?
17 A    No, they were simply leaning up against the wall.
18 Q    And the .50 caliber, where was that placed?
19 A    That was laying on the floor directly below the window
20   next to the desk.
21 Q    And did you find the -- any paperwork in there concerning
22   the classification of information, like classified
23   evidence?
24 A    Yes. On the desk to the left once you walked into the
25   office there were copies of various cover sheets that

Page 149

1    denoted United Nations, top secret, different types of
2    classification-type documents for intelligence agencies.
3    MR. SKROCKI: If I might approach, Judge?
4    THE COURT: Yes.
5  Q    Now, agent, that's Exhibit No. 6. If you could thumb
6    through that for me, or it's a copy of Exhibit No. 6.
7  A    Uh-huh.
8  Q    On the cover there's -- it says top secret. If you thumb
9    through it you can see one for the United Nations and the
10   CIA.
11 A    Yes.
12 Q    Did you see anything looking like that?
13   MR. SPAAN: Your Honor, if I could have a second, I don't
14   have 6 or it's not marked.
15   THE COURT: Is that from yesterday?
16   MR. SKROCKI: Yes, sir.
17   MR. SPAAN: Oh, I'm sorry. I -- if I could have -- borrow
18 your copy, Mr. Skrocki?
19   MR. SKROCKI: We'll just stop just for a second.
20   MR. SPAAN: Okay. Oh, okay, I'm sorry.
21   MR. SKROCKI: Okay.
22   MR. SPAAN: That was from yesterday.
23 Q    So did you see similar cover sheets, we'll call them, or
24   if you saw them as something else besides a cover sheet
25   correct me, but did you see those types in.....

38 (Pages 146 to 149)

EXHIBIT # _____ C _____
Page # __38__ of __62__

U.S.A. v. KANE
CASE NO. 3:06-mj-00011-JDR

TRANSCRIPT OF PROCEEDINGS
FEBRUARY 7 & 8, 2006

---

Page 150

1  A   This.....
2  Q   .....that office you're talking about?
3  A   Yes, this is exactly what we saw in that office.
4  Q   About how many copies of this type of material did you
5      see?
6  A   Approximately 15.
7  Q   Fifteen?
8  A   Yes.
9  Q   Handing you what we've marked as Exhibit 15, this is a new
10     number of a continuation from yesterday, and is that
11     something that was found during the course of the search
12     at C Street as well?
13 A   Yes, it was.
14 Q   Okay. If you could take a look at that, there's a --
15     looks like a handwritten notation on the front.
16 A   Uh-huh.
17 Q   And there are two memos attached to that as well, correct?
18 A   Correct.
19 Q   And there's something different about one memo, and it's
20     the first memo and the second memo?
21 A   Correct.
22 Q   And the handwriting on the front sort of explains what's
23     going on there; is that correct?
24 A   Correct.
25 Q   Would you give a summation to the Judge, please.

---

Page 151

1  A   Sure. These are memos from Nick Opegard (ph) and -- to
2      Craig Walther (ph), and in the memos, the handwritten copy
3      on top, it's a note to Nick to Rob. It says it's
4      unfortunate that I wasn't aware of your desire to not have
5      your name included in company correspondence. I certainly
6      would have respected your wishes, and will do so in the
7      future. And the two copies that are attached, the first
8      one had a yellow sticky note on it marked original, and in
9      that memo Rob Kane's name is mentioned. In the second
10     memo that's attached, it's an identical copy with a sticky
11     note that was noted replacement for Mark and Rob.
12     However, in this copy of the memo Mr. Kane's name is not
13     included.
14     MR. SKROCKI: Move to admit 15.
15     MR. SPAAN: No objection, Your Honor.
16     THE COURT: Admitted for purposes of this hearing.
17     (Plaintiff's Exhibit 15 admitted)
18     THE COURT: Do you have copies for the Court, or do I need
19 to wait and see the originals that you're showing there?
20     MR. SKROCKI: I have copies for you, Your Honor, from
21 yesterday's hearing.
22     THE COURT: Thank you. I now have a copy of 16 and 17.
23 Q   16, if I have the numbers right, Agent Bronkhorst, is
24     dated January 20th of '06?
25     MR. SPAAN: Your Honor, we don't have anything marked 16.

---

Page 152

1      MR. SKROCKI: I can assist.
2      THE COURT: Looks like it used to be 18.
3      MR. SKROCKI: I'm sorry?
4      THE COURT: At one time it was marked 18. Been
5  marked.....
6      MR. SKROCKI: That was the next one in sequence. We just
7  scratched it out so you'd have a number.
8  Q   If I have that right number, 16 is January 26th? Or.....
9  A   Yes.
10 Q   .....January 20th of '06?
11 A   Yes.
12 Q   Okay, it's a letter from Dennis Hopper; is that true?
13 A   Correct.
14 Q   Seems he says director of operations, Quiet Technologies?
15 A   Correct.
16 Q   Okay. To your knowledge, Agent Bronkhorst, was
17     Mr. Hopper, did he have an office at the C Street address?
18 A   Yes, he did.
19 Q   He was a federal firearms licensee.
20 A   Yes.
21 Q   What's this letter purport to do here?
22 A   This letter is -- is from Mr. Hopper, and in it he states
23     that he is assigning Robert Kane as an agent of Quiet
24     Technologies to act on his behalf for the purpose of
25     demonstrating, displaying and providing a written

---

Page 153

1      evaluation of company products, along with Mr. Kane will
2      provide proper security and control of -- of these
3      weapons. His assignment will expire, it says, on
4      September 1st, 2006.
5  Q   September 1 of '06?
6  A   Correct.
7  Q   And at the bottom it says it's a class 7 NFA manufacturer;
8      do you know what that is?
9  A   I do not.
10 Q   Okay. But he does have a federal firearms license.
11 A   Yes.
12 Q   And if you could turn your attention to 18, on the upper
13     left-hand side it says Life Port (ph), Inc.
14 A   Correct.
15 Q   And that came from the search at C Street as well?
16     MR. SPAAN: I'm sorry.....
17     MR. SKROCKI: What?
18     MR. SPAAN: Excuse me.....
19 A   17.
20     MR. SPAAN: .....is this 17 or 18?
21     MR. SKROCKI: Sorry about that.
22 Q   What does it say?
23 A   I have 17.
24     MR. SKROCKI: 17.
25     MR. SPAAN: All right.

---

MIDNIGHT SUN COURT REPORTERS
(907) 258-7100

EXHIBIT #_____C____
Page #____39____ of ____62____

U.S.A. v. KANE
CASE NO. 3:06-mj-00011-JDR

TRANSCRIPT OF PROCEEDINGS
FEBRUARY 7 & 8, 2006

Page 154

1    MR. SKROCKI: I am numerically challenged today. Pardon
2    me.
3  Q   17, Life Port on the left-hand side?
4  A   Yes.
5  Q   Okay, it's -- there's a cover -- fax cover sheet that's to
6    Mark Avery, correct?
7  A   Correct.
8  Q   And the business listing is for Regional Protective
9    Services.
10 A   Yes.
11 Q   Now, and that's the -- there's a date on the fax of the
12    16th of January of 2006?
13 A   Yes.
14 Q   Would you turn the page over? Second page states there's
15    some meeting minutes.
16 A   Yes.
17 Q   And there's some attendees listed on the left?
18 A   Uh-huh. Yes.
19 Q   And does Mr. Kane's name appear there?
20 A   Yes, it does.
21 Q   In what fashion?
22 A   It says Commander Rob Kane, initials C.K.
23 Q   And above it is -- Mark Avery's there as well?
24 A   Yes.
25 Q   And above that there's the name of a business.

Page 155

1  A   Yes, Regional Protective Services, RPS.
2  Q   Would you turn the page for me? And one more time to the
3    fourth and last page. On the upper left there is a
4    paragraph or a listing for a number 6. Do you see that?
5  A   Yes.
6  Q   And that says -- where it says NZ discussed LP armor
7    solutions?
8  A   Yes.
9  Q   If you go down to 6.4, what does that say?
10 A   M.A. would like L.P. to consider armoring two of RPS's
11    Suburbans.
12 Q   Okay, M.A. would be who? Like according to this fax.
13 A   According to this fax M.A. would be Mark Avery.
14 Q   And if you go down to 6.7, what does that say?
15 A   That reads M.A. requested that L.P. provide RPS with
16    armoring recommendation to protect G3 N57NP from small
17    arms fire during taxi, takeoff and landing.
18 Q   Okay, do you know what a G3 is?
19 A   Gulfstream aircraft.
20 Q   And what -- and N57NP appears to be what to you?
21 A   The tail number.
22 Q   And there's a reference above all of these, if you go back
23    up for me to 6.1, they reference armor flooring in a UH
24    dash 1H.
25 A   Yes.

Page 156

1  Q   Do you know what that is, what a UH-1H would be?
2  A   I do not.
3  Q   If you go to 6.3, it states RPS would like to receive a
4    proposal for flooring and wraparound panels for the UH-1H.
5  A   Yes.
6  Q   That says that there as well, correct?
7  A   Correct.
8  Q   Now, at the bottom of that fax there's a distribution
9    list?
10 A   Yes.
11 Q   And it's -- there's some initials there and some names of
12    individuals. Could you read those, please?
13 A   RPS, Mark Avery, Commander Kane and Dennis Hopper, and
14    L.P., Gary Darlie (ph), Frank Graham (ph), and Noah
15    Zuckerman (ph).
16 Q   Okay, so if we see -- on this exhibit if we see N.Z. that
17    might mean Noah Zuckerman?
18 A   Correct.
19    MR. SKROCKI: Move for the admission of 17.
20    MR. SPAAN: No objection, Your Honor.
21    THE COURT: Admitted.
22        (Plaintiff's Exhibit 17 admitted)
23    MR. SKROCKI: All the questions I have, Your Honor.
24    THE COURT: Mr. Spaan, your turn.
25    MR. SPAAN: Oh, thank you, Your Honor. Let me make sure

Page 157

1    I've got the exhibits, agent. I'll just be one second.
2        JOLENE BRONKHORST
3    testified as follows on:
4        CROSS-EXAMINATION
5    BY MR. SPAAN:
6  Q   Agent, my name is Mike Spaan. Good afternoon.
7  A   Good afternoon.
8  Q   I guess what I'd like to do with you is go through the
9    exhibits, and I just have a couple questions. Your
10    testimony was you found Exhibit 1, correct, in Mr. Kane's
11    office.
12 A   Correct.
13 Q   And we identified it as his office. There was a nameplate
14    outside that said commander, correct?
15 A   Correct.
16 Q   Okay. And you said you found it under the table. Was
17    this empty thing hidden under the table or was this
18    sitting under the table?
19 A   No, it was in a brown envelope, and there were other
20    documents with it there as well.
21 Q   And what were the other documents?
22 A   I would have to -- to look at the evidence. I'm not sure.
23 Q   Okay, but you didn't find one of these filled out by
24    anybody, right?
25 A   No.

40 (Pages 154 to 157)

EXHIBIT # _____ C _____
Page # ___ 40 ___ of ___ 62 ___

U.S.A. v. KANE
CASE NO. 3:06-mj-00011-JDR

TRANSCRIPT OF PROCEEDINGS
FEBRUARY 7 & 8, 2006

Page 158

1 Q   And there certainly would be nothing wrong in possessing
2     an application for permanent residency in the Bahamas that
3     you're aware of.
4 A   No.
5 Q   With your training, correct?
6 A   No.
7 Q   The second item was business cards, and let me find
8     number 2.  There's certainly nothing illegal about having
9     business cards, correct?
10 A  Correct.
11 Q  Have you identified who any of these people are?  I mean,
12    it says one's a presidente and one's a manager.  Do you
13    know who these people are on these business cards?
14 A  No, other than what's identified on the cards.
15 Q  Okay.  What did you do to verify the -- whether or not
16    Mr. Kane had any money at all in this HSBC account?
17 A  I have not done anything to verify that.
18 Q  So if I told you there was zero money in that as a
19    proffer, you wouldn't know if I was correct or not.
20 A  I would not.
21 Q  Thank you.  On number 3 -- or not number 3.  Before you
22    talked about finding some guns.  Was this in the big
23    office, the small office, both offices?
24 A  The guns that I identified were in the smaller office.....
25 Q  Okay.

Page 159

1 A   .....in the northwest corner.
2 Q   And as far as you know, all these guns are perfectly
3     legal.
4 A   Correct.
5 Q   And there's no reason Mr. Kane cannot possess those
6     weapons that you're aware of.
7 A   Correct.
8 Q   Okay.  Now, we went through number 6, and number 6 I'd
9     seen before.  These were the -- like little deals that
10    said top secret, UN, and stuff like that.  Was there any
11    material in these or were these just like displays?
12 A  It was a stack, again, approximately 15, that were kind of
13    strewn about the desk, laying about the desk.
14 Q  Right, not concealed.
15 A  No.
16 Q  Nothing that you're aware of that would make the
17    possession of those things illegal, is there?
18 A  No.
19 Q  Okay.  On number 15, if it was 15, we got a -- there's a
20    memo, and your testimony was that -- at least the
21    importance during your testimony, that somehow Rob did not
22    want to be on the -- included in the company
23    correspondence; is that correct?
24 A  Correct.
25 Q  And was the correspondence that was changed about anything

Page 160

1     illegal or suspicious or anything?
2 A   No.
3 Q   So what we know from this exhibit is Mr. Kane didn't want
4     to be listed in the company correspondence, correct?
5 A   Correct.
6 Q   Nothing illegal about that.
7 A   Correct.
8 Q   Number 16 is Mr. Hopper assigned to Mr. Kane an agent of
9     Quiet Technologies GP to act on behalf for the purpose of
10    demonstrating, displaying and providing written
11    evaluations of company products.  Where did you find this?
12 A   This was found -- I believe this was found in the smaller
13    of the two offices.
14 Q   Okay, was it -- where was this found in the smaller of two
15    -- of the office?
16 A   That I'm not aware of.
17 Q   Okay.  And to your knowledge there's nothing illegal about
18    Mr. -- excuse me, let me get my glasses.  Apologize --
19    Mr. Hopper appointing Mr. Kane as his agent, right?
20 A   I'm not aware of what the rules are for the NFA.
21 Q   Okay.  Now, when we talk about this second office was
22    there a sign out there that said Commander Kane or
23    anything?
24 A   No, there was not.
25 Q   And how did you determine that this was Mr. Kane's office?

Page 161

1 A   We determined that by the documents that we found in the
2     office, emails to him, emails that were sent from him,
3     copies of those emails, letters.....
4 Q   Okay, and.....
5 A   .....those types of things.
6 Q   .....they were what, normal business correspondence?
7 A   Business letters, emails.....
8 Q   Okay.
9 A   .....referencing the businesses, yes.
10 Q   And if it was anything of particular interest you would
11    have brought it in today, correct?
12 A   Correct.
13 Q   Okay.  Now, on number 17 is we talk a lot about this is a
14    meeting that Mr. Kane was at, and I believe it was your
15    testimony that you did not know what a UH-1H is.
16 A   I.....
17 Q   Correct?
18 A   I do not.
19 Q   Neither do I, so I can't even ask you a question about
20    that, but do you know if any of the -- if this Gulfstream
21    would fly into foreign countries; do you know where this
22    plane goes?
23 A   I do not.
24 Q   Okay.  Is there anything illegal about armoring -- putting
25    armor on an airplane that you're aware of?

41 (Pages 158 to 161)

EXHIBIT # _____C_____
Page # ___41___ of ___62___

U.S.A. v. KANE
CASE NO. 3:06-mj-00011-JDR

TRANSCRIPT OF PROCEEDINGS
FEBRUARY 7 & 8, 2006

---

Page 162

1   A    Not that I'm aware of.
2   Q    In fact, if you went into some places that were dangerous,
3        it might be a prudent thing to do.
4   A    It may be.
5   Q    Okay.  Do you know whether the bureau has any armored
6        Suburbans?
7        MR. SKROCKI:  Objection.....
8   A    I.....
9        MR. SKROCKI:  .....what's the relevance of that?
10       THE COURT:  Sustained.
11  Q    Do you know whether or not it's illegal for a private
12       citizen to armor a Suburban?
13  A    I do not know.
14       MR. SPAAN:  No further questions, Your Honor.  Thank you,
15  agent.
16       THE COURT:  Any redirect?  Does the Government intend for
17  16 to be admitted?
18       MR. SKROCKI:  That's the only that I have, Your Honor, if
19  I could so move.
20       THE COURT:  Any objection?
21       MR. SPAAN:  No objection.
22       THE COURT:  16 is admitted.
23           (Plaintiff's Exhibit 16 admitted)
24       THE COURT:  You may step down.
25       MR. SPAAN:  So that's all we have on the issue of

---

Page 163

1   detention, flight risk and danger to the community.
2        THE COURT:  Mr. Spaan, do you have any evidence?
3        MR. SPAAN:  Yes, Your Honor, I do.  I'd like to call
4   Mr. Griffith to the stand at this time.
5        THE CLERK:  Sir, can you raise your right hand?
6        (Oath administered)
7        MR. GRIFFITH:  I do.
8        THE CLERK:  Thank you.  Please be seated.
9            EVAN "JOE" GRIFFITH
10  called as a witness on behalf of the defendant, testified as
11  follows on:
12           DIRECT EXAMINATION
13       THE CLERK:  Please be sure to speak into the microphone at
14  all times.  Please state your full name, spelling your last
15  name.
16  A    Evan J. Griffith.  I go by Joe.  G-r-i-f-f-i-t-h.
17       THE CLERK:  Thank you.
18       THE COURT:  You may inquire.
19       MR. SPAAN:  Thank you.
20  BY MR. SPAAN:
21  Q    Good afternoon, Mr. Griffith.
22  A    Good afternoon.
23  Q    Have we met before today?
24  A    No, we have not.
25  Q    Okay.  Now, did you attend Mr. Kane's court hearing

---

Page 164

1   yesterday?
2   A    No, I did not.
3   Q    And why was that?
4   A    I was traveling from the Lower 48 at the time.
5   Q    Mr. Griffith, could you give the Court a -- your
6        background, your professional background?
7   A    I have spent 24 years in the Air Force.  I was a career
8        Air Force officer retiring as a colonel commander of the
9        21st tac. fighter wing in 1984.  While in the Air Force I
10       was in operational test and evaluation of munitions,
11       guided munitions, free-fall munitions, on the develop
12       program for several fire control systems, some of which
13       are still in operation.  I was instructor at the fighter
14       weapons school.  I was by Air Force specialty code a
15       fighter weapons instructor.  I served as eighth tac.
16       fighter wing -- wing weapons officer for nearly a year in
17       combat.  I flew three tours in Southeast Asia, NF4's.  I
18       retired from the Air Force in 1984, stayed in the
19       community, and later moved up to my most recent past
20       employment as CEO of Chugach Electric.
21  Q    Okay.  And are you -- and when was that?  What -- just
22       briefly describe that for the Court.
23  A    From 1989 I was hired as chief financial officer for
24       Chugach Electric.  I served in that capacity until 1997,
25       at which time I took over the whole generation asset

---

Page 165

1   package of Chugach Electric.  I ran that until 2002, when
2        I was selected as chief executive officer, and I served in
3        that capacity until September 2nd, I believe, of 2005.
4   Q    Okay, now, are you doing any work for Security Aviation or
5        any of its companies at this time?
6   A    Upon leaving Chugach I went to work for Security as a
7        management consultant, fighter training consultant, and
8        general trainer and pilot for the L-39 program.
9   Q    Okay, and you have piloted the L-39s; is that correct?
10  A    I have probably close to 100 hours on the L-39.
11  Q    Well, it's inspiration they still let us old guys fly
12       jets.
13  A    For -- it is at that.
14  Q    Now, you gave me some of your expertise regrading
15       armaments, munitions, and I believe it was your testimony,
16       sir, that you taught this stuff, correct?
17  A    I did.  I taught it, I operationally controlled it, I was
18       the wing weapons officer for the eighth tac. fighter wing,
19       and we dropped tons of ordnance.....
20  Q    Okay.
21  A    .....every day in Southeast Asia for years.
22  Q    Did you get a copy of Special Agent Campe's affidavit
23       describing some rocket pods that were seized from Security
24       Aviation?
25  A    I did.

---

42 (Pages 162 to 165)

EXHIBIT # _____C_____
Page # ___42___ of ___62___