U.S.A. v. KANE  
CASE NO. 3:06-mj-00011-JDR

TRANSCRIPT OF PROCEEDINGS  
FEBRUARY 7 & 8, 2006

---

Page 166

1  Q  Did you review that?
2  A  I did.
3  Q  Did you have an opportunity, sir, to review these rocket
4     pods that were seized?
5  A  I've had -- have seen the pods and inspected them, yes.
6  Q  Okay.
7  A  Not after they were seized, but before that.
8  Q  Well, I kind of figured.
9     MR. SKROCKI: Your Honor, might I inquire as to the
10 relevancy of the line of testimony concerning bail on this
11 issue?
12    THE COURT: Mr. Spaan.
13    MR. SPAAN: Your Honor, it's very clear when you look at
14 the statute the weight of the evidence is one of the things this
15 Court has to opine on. Mr. Kane is allowed to present evidence.
16 He could have presented that evidence from a proffer, but I'm
17 putting Mr. Griffith up here. He'll have his opportunity to
18 cross-examine.
19    MR. SKROCKI: If I might, if this is going to turn into an
20 expert battle, we have an expert, but he's on the East Coast,
21 and we had no notice that this individual was going to be called
22 as a witness, and Mr. Spaan's correct, the weight is of import,
23 but you're allowed to take it -- the weight as it is presently
24 here today, not through a battle of experts. If he's going to
25 put this witness on, we'd request a continuance to get

---

Page 167

1  Mr. Griffith here to rebut.
2     MR. SPAAN: Well, I don't.....
3     MR. SKROCKI: This is bail, not probable cause.
4     MR. SPAAN: Yeah, and it's a constitutional right to bail.
5  He has a right to be out unless Your Honor makes some findings,
6  and I don't have to tell him my witnesses. I got his exhibits
7  the second I walked into here. I am permitted to present this
8  witness.
9     THE COURT: Well, I -- my suspicion is that this goes to
10 the trial of the case and not to the weight of the probable
11 cause. For bail probable cause is all that's needed, and we
12 don't.....
13    MR. SPAAN: Your Honor, it.....
14    THE COURT: .....we don't determine -- well.....
15    MR. SPAAN: Can -- it.....
16    THE COURT: .....I'm just telling you we're not going to
17 try the case here.
18    MR. SPAAN: I'm not going to try the case. I've got three
19 or four more questions for Mr. Griffith. I'd like to read the
20 statute with Your Honor. I know you're more familiar with it
21 than I am.
22    THE COURT: You don't have to read it.
23    MR. SPAAN: I just read it. Mr. Kane has a right to
24 present this evidence.
25    THE COURT: Well, it depends on what it's offered for.

---

Page 168

1     MR. SPAAN: Well, what he's going to testify to is that
2  those pods were not operative, and that goes to the weight of
3  the evidence, and he could be cross-examined by the United
4  States of America right now.
5     MR. SKROCKI: Well, that's fine, Your Honor, but it's
6  still -- he's rendering an expert opinion is what he's doing.
7     MR. SPAAN: Your Honor, we had their expert in through
8  Agent Campe, who was not available. They could have flown their
9  expert out. They chose not to. First they put an agent on the
10 stand who knew nothing about it. Then they put Agent Campe who
11 said I don't know, I talked to the BATF guy. Did I get to
12 cross-examine him? No. I'm putting him on. He could cross-
13 examine him.
14    MR. SKROCKI: This is.....
15    THE COURT: Has the Government argued that they were
16 operative?
17    MR. SKROCKI: No, we argued he's possession -- possessing
18 an unregistered rocket pod.
19    MR. SPAAN: Let's go through the affidavit, Your Honor.
20 Witness B told Agent Campe that these were good to go. We're
21 going to find out they were not good to go in Mr. Griffith's
22 experience, which is considerable.
23    MR. SKROCKI: The issue before the Court is bail.
24    MR. SPAAN: Right.
25    MR. SKROCKI: You've heard Mr. Spaan's arguments already.

---

Page 169

1  We should be provided an opportunity if he's going to put on an
2  expert to have our own expert testify about this, because it
3  will directly contradict what he says per.....
4     THE COURT: Mr. Spaan.....
5     MR. SKROCKI: .....the statute.....
6     THE COURT: .....make your proffer. I'm not going to hear
7  expert testimony. This is a bail hearing. The problem is you
8  can't hear it piecemeal and.....
9     MR. SPAAN: Your Honor, this is my proffer, and it's
10 important that we have this record, because however this turns
11 out there might be an immediate appeal taken, okay?
12    THE COURT: Sure.
13    MR. SPAAN: So here's the record.
14    THE COURT: Either way it goes, I understand.
15    MR. SPAAN: Either way it goes. Mr. Griffith has
16 testified to his experience. If asked, Mr. Griffith would
17 testify that he examined these pods when they arrived, that they
18 were opened in the crates with a group of people around them.
19 He'll further testify that nobody invoked a code of silence,
20 that these pods appeared. He's going to testify that he looked
21 at those to make sure they were demilitarized, because when they
22 bought them they were assured by the seller that these were
23 deactivated, demilitarized, and good to use for static display
24 or as an accessory. He will further testify that he has
25 reviewed the ad which the people purchased these pods from and

---

43 (Pages 166 to 169)

Page 170

1  it is what's been marked as Exhibit A for today.
2       THE CLERK: We already have an Exhibit A, Your Honor.
3       THE COURT: You'll have to add a different letter, unless
4  this is the same Exhibit A.
5       MR. SPAAN: This is the same one, but it didn't come into
6  evidence and I'm going to ask that it be admitted. Now, he will
7  testify that this is the site that the people at Security
8  Aviation used to purchase this pod. This on itself says it's
9  still with the Russian markings and graphics, which we heard
10 some testimony from Agent Campe about, that he had made red
11 dummy rockets which are shown in the photo from solid aluminum
12 stock, that -- let's see -- whether you're an F-39 owner, just
13 want to stand up a pair in the corner of your office, want to
14 make a coffee table out of them, or hang them from the ceiling
15 in your hangar or VFW hall, these are a rare find and will not
16 last long. This is the ad they answered.
17      He would also establish that demil. means legal, they have
18 been demilitarized. He will testify that he inspected those
19 pods and there was no way that those would file -- could fire.
20 In fact, he would testify that from the visual observation I
21 concluded that the pods had been thoroughly demilitarized.
22 Security personnel was also informed by the seller of the pods.
23 They had been demilitarized prior to purchasing them. I
24 detected none of the necessary attendant wiring, fire timing
25 devices or connecting hardware. There was nothing electrical

Page 171

1  attached to the pods. In effect, they were only empty cans and
2  tubes. It would have been impossible to fire a rocket with a
3  pod in that condition.
4       I would -- I was also prepared to ask him to comment on
5  Agent Campe's observation that he saw a plug or something on the
6  end of it, but I don't know what his answer is on that, so I
7  can't make a proffer unless you let me ask him that question or
8  talk to him.
9       THE COURT: All right, this is a bail hearing, this is not
10 the trial of the case, what -- sufficiency test of probable
11 cause, basically what the Government is relying upon in the
12 case, eyewitnesses, the strength of the case the Government has,
13 but it's not the main factor. The two factors here at flight
14 risk and danger to the community. What you're putting on
15 basically is a defense, and I'm not going to hear part of it and
16 then comment on whether I think it's a strong defense or not a
17 strong.....
18      MR. SPAAN: Well.....
19      THE COURT: .....defense.
20      MR. SPAAN: .....Your Honor.....
21      THE COURT: I'm just talking. Just a minute.
22      MR. SPAAN: I apologize.
23      THE COURT: I will not hear the expert testimony. You've
24 made your proffer.
25      MR. SPAAN: I'm not done with the proffer, Your Honor.

Page 172

1  Mr. Griffith would further testify that he has information
2  regarding the -- what the seller of the pods relayed, that he
3  would relay that these were demilitarized, and, in fact, they're
4  looking for the paperwork because they were imported into the
5  United States and cleared by the BATF. Let me see what else.
6       He would also testify, Your Honor, that Mr. Kane does not
7  have.....
8       MR. SKROCKI: Your Honor.....
9       MR. SPAAN: .....a pilot's license.
10      MR. SKROCKI: .....I -- I'm sorry, but we really are
11 trying this in front of the media here. I mean.....
12      THE COURT: Well, I think that's what.....
13      MR. SKROCKI: this has gone on long enough.
14      THE COURT: .....you're doing, you're making a case for
15 the press.
16      MR. SPAAN: I'm making a proffer, Your Honor, because.....
17      THE COURT: Well, you've made enough of it, and I'll just
18 tell you that all of this goes to the probable cause in one
19 sense, if it goes to anything, but it wasn't offered then, that
20 hearing is closed, and let's move on with the bail hearing.
21 This is.....
22      MR. SPAAN: Okay, if.....
23      THE COURT: .....mid afternoon.
24      MR. SPAAN: Good, and if I could just make one more point,
25 Your Honor, just to make sure where my proffer is going. When I

Page 173

1  read 18 U.S.C. 3142 it says: A person shall be afforded an
2  opportunity to testify, to present witnesses, to cross-examine
3  witnesses who appear at the hearing, and to present information
4  by proffer or otherwise. (g), factors to be considered. The
5  nature and the circumstances of the offense charged. And
6  there's a reason for that. In -- when you're trying to detain a
7  person it makes less sense to detain a person where the evidence
8  is weaker, and that's why that is in the statute. That's my
9  proffer.
10      THE COURT: Mr. Spaan, we try cases in this courthouse all
11 the time. Some people win and some lose because the Government
12 doesn't prove its case or because it's not a meritorious case.
13 We're not going to decide the merits of the case here, and
14 that's what this goes to, so I've made my ruling.
15      MR. SPAAN: Well, Your Honor, thank you. Thank you,
16 Mr. Griffin.
17      THE COURT: You may step down, Mr. Griffin.
18      (Witness excused)
19      THE COURT: It's interesting information, but this is not
20 the right forum, so I.....
21      MR. SPAAN: Well.....
22      THE COURT: .....I'm not able to entertain it.
23      MR. SPAAN: I understand. I respectfully disagree, but
24 there we are. We'd call Mr. Ted Smith to the stand, please.
25      THE CLERK: Please raise your right hand.

U.S.A. v. KANE
CASE NO. 3:06-mj-00011-JDR

TRANSCRIPT OF PROCEEDINGS
FEBRUARY 7 & 8, 2006

Page 174

1  (Oath administered)
2  SERGEANT SMITH: I do.
3  THE CLERK: Thank you.
4       SERGEANT TED SMITH
5  called as a witness on behalf of the defendant, testified as
6  follows on:
7       DIRECT EXAMINATION
8  THE CLERK: Please be sure to speak into the microphone.
9  A  Yes, ma'am.
10 THE CLERK: Please state your full name and spell your
11 last name.
12 A  Ted Smith, S-m-i-t-h.
13 THE CLERK: Thank you.
14 THE COURT: Proceed.
15 MR. SPAAN: Your Honor -- thank you, Your Honor.
16 BY MR. SPAAN:
17 Q  Your occupation, please, Mr. Smith.
18 A  Sergeant with the Anchorage Police Department.
19 Q  And how long have you been so employed?
20 A  Twenty-three years.
21 Q  Okay. And are you currently employed with the Anchorage
22    Police Department?
23 A  Yes, sir.
24 Q  Okay. What position do you have with the Anchorage Police
25    Department?

Page 175

1  A  I'm the in-service training coordinator, the chief range
2     master for the department, and the chief armorer.
3  Q  Okay. And in the course of your employment have you had
4     an opportunity to observe silencers?
5  A  Yes, sir. I have the responsibility to maintain about 30
6     suppressers that belong to the City.
7  Q  Okay, and what are some of the unique features of a
8     silencer?
9  A  Well, basically, it's a device that attaches to the end of
10    a firearm to suppress the sound of the exiting gases from
11    the muzzle.
12 Q  Okay, and the Government has maintained that this item
13    they seized, and we're going to talk about it in a second,
14    was designed to silence a .45 handgun, okay?
15 MR. SKROCKI: Objection, that mischaracterizes our
16 position. It's a silencer found with some guns, nothing more.
17 MR. SPAAN: Well.....
18 THE COURT: Well, there.....
19 MR. SPAAN: .....Your Honor.....
20 THE COURT: .....was testimony about a .45 caliber.
21 MR. SPAAN: Right.
22 MR. SKROCKI: There was, yes.
23 THE COURT: I recall it.
24 MR. SPAAN: Okay, thank you.
25 Q  How large of a handgun is a .45 caliber gun, Sergeant

Page 176

1     Smith?
2  A  Well, the -- the bore size, obviously, is .45 caliber.
3  Q  Right.
4  A  The size of the weapon can be varied. I mean,
5     there's.....
6  Q  Okay.
7  A  .....different kinds of -- different sizes of pistols.
8  Q  Is that a large bore size?
9  A  Yes, sir.
10 Q  Did you have an opportunity to examine the silencer or the
11    alleged silencer seized from Mr. Kane's house?
12 A  If that's what's in the evidence box, yes, sir, I looked
13    at it about an hour ago.
14 MR. SPAAN: Okay. Mr. Skrocki, could he look at it again?
15 A  Yes, that's what I looked at.
16 Q  Okay. Did you have an opportunity to look at it without
17    it being wrapped in anything?
18 A  Well, no, it was attached to the box. We couldn't take it
19    out of the box, but, I mean, we broke the box down and
20    kind of looked in the end.
21 Q  Okay, and what.....
22 THE COURT: Let's have it marked for identification,
23 please.
24 MR. SKROCKI: Ease of convenience, Government's 20.
25 THE COURT: Exhibit 20.

Page 177

1  MR. SPAAN: Certainly not -- I don't want to take
2  possession of this thing.
3  THE COURT: Exhibit 20.
4  THE CLERK: Mr. Spaan, can you put on that traveling mike,
5  please?
6  MR. SPAAN: I'm sorry?
7  THE CLERK: The traveling mike, can you put that on?
8  MR. SPAAN: Sorry.
9  Q  Mr. Smith, what was your professional conclusion regarding
10    the Government 20 which you have in front of you?
11 A  Well, barring the opportunity to actually pull it out of
12    the box and look at it closely, my assessment is that it
13    is not a real suppressor, that it's a -- a toy or a prop.
14 Q  And why do you base that conclusion on?
15 A  Well, primarily on two things. Number one, there are no
16    baffles inside, it's an empty tube.
17 Q  Uh-huh.
18 A  And number two, that the threads where it would attach to
19    the muzzle of the weapon are brass, and in my
20    profession -- professional opinion I -- I've never seen a
21    suppressor with brass threads. They're usually steel.
22 Q  Do you have an opinion -- and, again, .45's are all sizes
23    and stuff. What would happen if one fired a round in your
24    professional opinion through that device.....
25 A  It'd probably.....

45 (Pages 174 to 177)

U.S.A. v. KANE  
CASE NO. 3:06-mj-00011-JDR

TRANSCRIPT OF PROCEEDINGS  
FEBRUARY 7 & 8, 2006

Page 178

```
1   Q   .....a .45.....
2   A   .....break the end off it.
3   Q   Huh?
4   A   It'd probably break the end off it.
5   Q   Okay. In your opinion would that silencer suppress the
6       noise fired by the handgun?
7   A   No.
8   Q   Okay. Mr. Smith, at one time you had delivered to this
9       court at my request an application to be a third-party
10      custodian for Mr. Kane.
11  A   That's correct.
12  Q   And did you -- how did you come to know Mr. Kane?
13  A   Well, actually, I've known him for probably about 20
14      years. I -- I knew his father, who was a detective that
15      worked in my department, and I.....
16  Q   Okay.
17  A   .....met him when he was a kid.
18  Q   Okay. And when did you -- how long have you been friends
19      with Mr. Kane, then? I'm sorry.
20  A   Well, as he grew up, I mean, I lost touch with him, and
21      then about a year or so ago I guess he moved back into the
22      state and he connected up with people that he knew in the
23      past, and I was one of them.
24  Q   Okay. And did anything happen between the time you
25      returned the application to me and today, sir, that's
```

Page 179

```
1       impacting your decision on whether or not you'd be a
2       third-party custodian for Mr. Kane?
3   A   Yes, sir. Because of my employment, in accordance with
4       our procedural instructions I contacted my chain of
5       command.....
6   Q   Okay.
7   A   .....and requested permission, and the chain of command
8       suggested that just to make sure that there was no harm to
9       either the Municipality or to Security Aviation that I not
10      participate as a third-party custodian.
11  Q   Okay. And did you propose an alternative plan to me, sir?
12  A   Yes. I -- my wife said that she would be willing to be a
13      custodian.
14  Q   Okay, and that means Mr. Kane if this is approved by the
15      Court or required by the Court would be spending the
16      evenings at your house. Is that okay with you?
17  A   That's okay with me.
18  Q   And do you have -- as a police officer I assume you have
19      firearms.
20  A   Yes.
21  Q   And would you secure those firearms?
22  A   Sure. I have a safe where most of them are stored anyway.
23  Q   Okay. And even though you wouldn't be the third-party
24      custodian, would you also promise if the Court asked to
25      report if Mr. Kane left or violated any of the conditions
```

Page 180

```
1       of his release?
2   A   Oh, absolutely.
3   Q   You'd have no hesitation.
4   A   No, sir.
5   Q   Okay. Let me ask you this: You've discussed Mr. Kane
6       with law enforcement personnel before, correct?
7   A   Yes, I have.
8   Q   Okay. During that time did -- was Mr. Kane's previous
9       criminal record brought up?
10  A   Yes.
11  Q   Okay. And did you know that Mr. Kane in 1989 was charged
12      with assault, nonaggrava-- nonaggravated assault, and was
13      given a sentence -- I guess he -- it was a suspended
14      imposition of sentence with one day in jail and a 50-
15      dollar fine?
16  A   I did know that.
17  Q   Okay, and how old was Mr. Kane, if you have an idea when
18      that happened?
19  A   Eighteen or 19, something like that.
20  Q   Okay. And were you aware that on October 6th -- excuse
21      me, on June 18th, 1993 -- I apologize, Your Honor, I read
22      that wrong -- that Mr. Kane was charged with a two-count
23      complaint, it looks like count I, assault, count II,
24      failure to appear?
25  A   I didn't know the particulars, but I'm -- I was aware of
```

Page 181

```
1       the charges. I.....
2   Q   And were you.....
3   A   .....didn't know the dates.
4   Q   .....aware -- what was your understanding of the
5       disposition of those charges?
6   A   They were dismissed.
7   Q   And why were they dismissed?
8   A   That it had something to do with a case that he was
9       working. He was assisting a law enforcement agency.
10  Q   Okay. And in your experience would it be unusual for
11      somebody to dismiss a case out of the goodness of their
12      heart without something more?
13  A   Oh, no.
14      MR. SPAAN: Your Honor, I had one note from my colleague,
15  if I could have one second. It'll be.....
16      THE COURT: Yes.
17      MR. SPAAN: .....my last question.
18      THE COURT: Don't forget you're wired.
19      MR. SPAAN: Huh?
20      THE COURT: Don't forget you're wired, so you don't trip.
21      MR. SPAAN: Oh. Talk too loud.
22  Q   Sergeant, do you know an individual by the name of --
23      whoops, I'm all caught up here -- Skip Brandon (ph)?
24  A   Yes, sir.
25  Q   And when did you meet him?
```

46 (Pages 178 to 181)

U.S.A. v. KANE
CASE NO. 3:06-mj-00011-JDR

TRANSCRIPT OF PROCEEDINGS
FEBRUARY 7 & 8, 2006

Page 182

1   A   Probably close to a year ago.
2   Q   Okay, and what was.....
3       MR. SKROCKI: Objection, and the relevancy of this
4   questioning is?
5       MR. SPAAN: Well, it has to go, I mean, to whether or not
6   you're going to detain Mr. Kane or not.
7       THE COURT: Well, I.....
8       MR. SPAAN: I mean.....
9       THE COURT: .....don't know who Skip Brandon is.
10      MR. SPAAN: Well, that's what I asked him.
11      THE COURT: Well, the question is why is it relevant.
12  Q   Okay, to your knowledge is Mr. Brandon involved in law
13      enforcement?
14  A   Not currently. My understanding is he retired.....
15  Q   Okay.
16  A   .....from law enforcement.
17  Q   And he was involved.....
18      MR. SKROCKI: Same question, Your Honor, what's the
19  relevancy of this. We're -- I think we're again coming to this
20  precipice where we're putting in little bits and kernels for the
21  media about what his defense is.....
22      THE COURT: Yeah.
23      MR. SKROCKI: .....and it's not appropriate. We don't
24  care who Skip Brandon is at this stage of the game.
25      MR. SPAAN: Well, Your Honor, little bits and pieces are

Page 183

1   because of his objections. Now, I'm asking a question, you're
2   going to make a ruling, and I apologize, I.....
3       THE COURT: Don't apologize yet, you haven't heard the
4   ruling.
5       MR. SPAAN: I'm not expecting anything good, that --
6   but.....
7       THE COURT: Well, who -- why is Skip Brandon relevant? I
8   mean, this is a bail hearing. He's not a proposed custodian, is
9   he?
10      MR. SPAAN: Your Honor, no, he's not a proposed
11  custodian.....
12      THE COURT: So it goes what.....
13      MR. SPAAN: .....but -- but -- but he -- he.....
14      THE COURT: .....to the merits of the case.
15      MR. SPAAN: .....would show that Mr. Kane has ties with
16  current and past law enforcement, and that would go to what kind
17  of guy Mr. Kane is and whether or not he should be permitted out
18  of jail pending his trial.
19      THE COURT: Well, maybe Mr. Brandon knows something about
20  it, but I'm not interested in hearing about it through this
21  witness, through what Mr. Brandon might know.
22      MR. SPAAN: Okay. I heard you.
23      THE COURT: That's the ruling.
24      MR. SPAAN: Thank you, Mr. Smith.
25      THE COURT: Cross-examination.

Page 184

1           SERGEANT TED SMITH
2   testified as follows on:
3           CROSS-EXAMINATION
4   BY MR. SKROCKI:
5   Q   Afternoon, Mr. Smith.
6   A   Thank you.
7   Q   So you work for APD.
8   A   Yes, sir, I do.
9   Q   I've been here 15 years and never had the occasion of
10      meeting you, so good afternoon. Want to look at the
11      silencer there or the item you have in front of you,
12      Exhibit 20?
13  A   Yes, sir.
14      MR. SKROCKI: Madam Clerk, can you pick me up okay over
15  here? Is that good?
16  Q   Now, this is Exhibit 20 here, long cylindrical tube made
17      of metal?
18  A   It looks like it might be aluminum.
19  Q   Okay. To you it does, right?
20  A   Uh-huh.
21  Q   On the front it says U. S. Government, correct?
22  A   Yes, sir.
23  Q   And then it says Knight's Armament Company on there, too,
24      as well, doesn't it?
25  A   Yes, sir.

Page 185

1   Q   They make silencers, don't they?
2   A   They make a lot of weapons, yes.
3   Q   A lot of weapons? Silencers included?
4   A   Oh, yes.
5   Q   Okay. Now, you're an expert in this field, correct?
6   A   I don't think I've been declared as an expert, yes.
7   Q   Well, this.....
8   A   Or yet.
9   Q   .....is what you do. I mean, you're an armorer, right?
10  A   Yes, sir. It is.
11  Q   You call silencers suppressors.
12  A   Yes, sir, I do.
13  Q   Okay. So if you were going in a house and you saw
14      something like that, you might look at it differently,
15      would you agree with me, than a new agent or somebody who
16      has not had your level of experience?
17  A   Until -- once I picked it up and looked at it I would be
18      able to decide what it was.
19  Q   Yeah, but somebody who was new or not versed in your
20      language or your ability or your expertise would look at
21      it differently, would you agree.....
22  A   Certainly.....
23  Q   .....than you would.
24  A   .....they might mistake it. Sure.
25  Q   Right? And if they have a really -- you know, an

47 (Pages 182 to 185)

U.S.A. v. KANE  
CASE NO. 3:06-mj-00011-JDR

TRANSCRIPT OF PROCEEDINGS  
FEBRUARY 7 & 8, 2006

Page 186

1  AUSA (ph) on their case and -- I mean, a new person, they
2  probably would have picked that up for inspection,
3  correct?
4  A  Yes, sir.
5  Q  Right? Most likely, right?
6  A  Most likely, yes.
7  Q  They would not leave it behind, would they?
8  A  No.
9  Q  Okay. And to get an expert opinion on whether that's a
10    real silencer or not, that would probably take an expert's
11    opinion to have it be looked at, correct?
12  A  Sure.
13  Q  And in the federal realm that's pretty much done through
14    ATF, isn't it?
15  A  Yes, sir.
16  Q  You're familiar with that, right?
17  A  Absolutely, yes.
18  Q  So that's going to probably take some time to get that
19    shipped off and get an opinion from ATF; would you not
20    agree with me?
21  A  Well, not necessarily shipped off if a local agent could
22    look at it.
23  Q  Perhaps, but if you want an expert, you'd have to probably
24    go to their headquarters and get an expert opinion,
25    correct?

Page 187

1  A  Wherever their expert is.
2  Q  Okay.
3  A  It -- it may be in D.C.
4  Q  Okay.
5  A  I don't know.
6  Q  Okay. Here or there, outside of Alaska more likely is
7    where you'd want to get somebody to testify in court;
8    would you agree with me?
9  A  Sure.
10  Q  Okay. So you don't know if that's been sent off to
11    Washington, D.C. yet for.....
12  A  I.....
13  Q  .....analysis.
14  A  I do not know.
15  Q  So if I understand the part of your proposal, Sergeant,
16    you're here vouching for Mr. Kane.....
17  A  Yes, sir.
18  Q  .....to some degree?
19  A  To a -- yes, sir.
20  Q  His wife, her first name is?
21  A  Karen.
22  Q  Karen. And what do you know about Mr. Kane's travels out
23    of the country?
24  A  Not much.
25  Q  Not much?

Page 188

1  A  Yeah, for the time that, you know, from -- he was a child,
2    to the time I re-met him a year or so ago, I don't know
3    what he's been doing.
4  Q  You have no idea where he's been.
5  A  No, sir.
6  Q  Would you know if he's been to the Middle East?
7  A  Have no idea.
8  Q  Philippines?
9  A  Well, I -- I mean, his wife is Filipino, so I would assume
10    he's been to the Philippines.
11  Q  Well, you don't know for sure.
12  A  No, sir.
13  Q  You're under oath, right, so you can't say for sure that
14    you know.
15  A  That's correct.
16  Q  Okay. England?
17  A  Don't know.
18  Q  Don't know? Guernsey Island?
19  A  No, sir.
20  Q  How about the Bahamas?
21  A  Don't know.
22  Q  He hasn't informed you about anything relating to his
23    travels.
24  A  Huh-uh.
25  Q  Okay. Let's talk about RPS for a minute. Do you know

Page 189

1    what RPS is, what it stands for?
2  A  My understanding is that there are several companies with
3    that initials.
4  Q  There are, aren't there?
5  A  Those initials. Yes.
6  Q  And which ones -- do you know what companies, what.....
7  A  Regional Protective.....
8  Q  .....which ones?
9  A  .....Services and Paramedic Services are the two that I'm
10    aware of.
11  Q  How about Regional Professional Services, heard about
12    that?
13  A  I haven't heard about it.
14  Q  So the RPS companies you know about, who owns them?
15  A  My understanding is Mark Avery and Mr. Kane.
16  Q  And Mr. Kane. He works for RPS?
17  A  I think so. I.....
18  Q  Okay.
19  A  .....don't know.
20  Q  Do you know if he owns RPS?
21  A  He might.
22  Q  He might.
23  A  I don't know. I haven't seen any paperwork.
24  Q  Okay, what he has told you about where he works and what
25    he does for RPS?

48 (Pages 186 to 189)

U.S.A. v. KANE
CASE NO. 3:06-mj-00011-JDR

TRANSCRIPT OF PROCEEDINGS
FEBRUARY 7 & 8, 2006

Page 190

1  A  He hasn't really told me anything specific. I just
2     assumed he worked there because when I've gone to talk to
3     Mr. Avery or talk to Mr. Kane they've been together.
4  Q  So you don't know what he does for a living?
5  A  Not specifically, no.
6  Q  Not a thing.
7  A  No, sir.
8  Q  Have you been to his house?
9  A  I have driven by it one time to stop and talk to him.
10 Q  Pretty big house, isn't it?
11 A  Yeah.
12 Q  It's a large house, isn't it?
13 A  Uh-huh.
14 Q  Pretty nice house, isn't it?
15 A  Well, I haven't been inside, but.....
16 Q  From the outside?
17 A  .....the outside looks nice.
18 Q  Have any idea how he finances that house?
19 A  No, sir, I don't.
20 Q  Do you have any idea what he does for Regional Protective
21    Services or when he goes over and sees Mark Avery what he
22    does?
23 A  No, I don't.
24 Q  Have you had any business relationships with RPS or Mark
25    Avery or Regional Protective Services, Security Aviation?

Page 191

1  A  I have because of my past as an Army aviator.
2  Q  Uh-huh.
3  A  I came up to Alaska as an Army helicopter pilot before I
4     became a police officer.
5  Q  Oh, right. You threw -- you flew helicopters up for them,
6     right?
7  A  Correct.
8  Q  Okay.
9  A  I brought two helicopters, two airframes up from the Lower
10    48.
11 Q  Okay. And you were paid for that service?
12 A  They paid for my expenses and then gave me a check
13    besides.
14 Q  How much?
15 A  One case, $5,000, and one case it was -- it worked out to
16    about $2,000.
17 Q  Two thousand? Long trip in a helicopter, huh?
18 A  It was a very long trip (indiscernible) yes, sir.
19 Q  Okay. Anything else, any kind of cars you might have
20    gotten from there, loans.....
21 A  Cars?
22 Q  .....you might have gotten from them?
23 A  No, sir.
24 Q  No loans? You sure about that?
25 A  Yes, sir.

Page 192

1  Q  Mr. Smith, Exhibit 21 is a check request on the front
2     cover from 6/28 of '05?
3  A  Yes, sir.
4  Q  Okay, and it's made -- seems to be made payable to you.
5  A  Yes, sir.
6  Q  For $20,000?
7  A  Yes, sir.
8  Q  And there's a line underneath, and why don't you read what
9     the -- the line request underneath. It's requested by
10    who?
11 A  By Rob.
12 Q  Okay, and is needed by when?
13 A  Now.
14 Q  Okay. And it says description of need loan?
15 A  It says loan.
16 Q  Loan. And it's signed by Mark Avery and apparently Rob
17    Kane.
18 A  Yes, sir.
19 Q  Is that correct?
20 A  That's correct.
21 Q  And on the back, second page, if you could turn that for
22    me, there's a check made out in your name.
23 A  Uh-huh. Yes, sir.
24 Q  Twenty thousand dollars.
25 A  Yes, sir.

Page 193

1  Q  Twenty thousand from Avery & Associates to you.
2  A  Yes, that's correct.
3  Q  Okay. Could you tell us what this is all about?
4  A  Yes. That was given to me to hand to a gentleman named
5     Sam Cohen (ph) for bail.
6  Q  Sam Cohen.
7  A  Sam Cohen, yes, sir.
8  Q  And who is Sam Cohen?
9  A  He's a friend of ours.
10 Q  Friend of yours? Who's "ours"?
11 A  Ours, Mr. Kane, myself, Mr. Avery.
12 Q  And it's for what reason?
13 A  For bail.
14 Q  For bail? For what kind of charge?
15 A  It was a -- it's an ongoing case with Mr. Cohen on a -- I
16    think a child abuse charge or something like that.
17 Q  Child pornography might.....
18 A  It might be, yes, sir.
19 Q  Yeah, possession of child pornography?
20 A  Uh-huh.
21 Q  Is he a law enforcement officer?
22 A  Yes, sir.
23 Q  For who?
24 A  Anchorage Police Department.
25 Q  APD. So Avery & Associates cut you a check for 20 grand

Page 194

1     and you gave it to Cohen.
2 A I turned around and -- yes, sir.
3 Q This says loan, doesn't it?
4 A It does.
5 Q Sammy Cohen's name on any of this?
6 A No, sir.
7 Q What were the terms of the loan?
8 A I assume Sam Cohen will pay it back.
9 Q You don't know that for a fact, though, do you?
10 A No, sir, I don't.
11 Q Did you ever see any letter or under-- interest or
12     anything else that goes with this?
13 A No, sir.
14 Q Okay. So, Sergeant, what's the proposal that you have
15     worked out with your wife; could you tell me about that?
16 A That we would allow him to spend nights at our home, we
17     have four bedrooms, and that during the daytime another
18     custodian would take possession of Mr. Kane.
19 Q Okay. Kids in the house?
20 A Yes, sir, one.
21 Q How old?
22 A Twelve.
23 Q My sympathies.
24 A Thank you.
25 Q Okay. So you have a teenager in the house.

Page 195

1 A Yes, sir.
2 Q And you're telling the Judge here you're going to lock up
3     your guns.
4 A Yes, sir.
5 Q So is there going to be some sort of a handoff during the
6     day and he comes to stay at your place at night; is that
7     how it's going to work?
8 A Yes, sir.
9 Q Who's doing the handing off?
10 A Mr. Sleeth, I believe, or -- I don't know if there are
11     other custodians. I believe there's more than one other.
12 Q There might be more than one?
13 A Uh-huh.
14 Q So it'd be whoever gets a chance to get Mr. Kane in their
15     possession for the day would do that and then go back to
16     your house for the night?
17 A I don't know the details, sir.
18 Q Do you know Mr. Kane's associates or his friends or who he
19     hangs out with?
20 A Aside from the folks he works with, no, sir, I don't.
21 Q None, nobody.
22 A Not that I'm aware of, no, sir.
23 Q Do you know what kind of hours he keeps at work?
24 A No, I don't.
25 Q You don't?

Page 196

1 A I understand he's sort of a workaholic, but -- spends a
2     lot of hours at work, but I don't know what his hours are.
3 Q He hasn't told you and you haven't seen him, I guess.
4 A No, sir.
5 Q You ever been in the C Street office of Avery &
6     Associates, RPS?
7 A Two or three times, yes, sir.
8 Q Two or three times? Is there a big Navy SEAL flag in
9     there, have you seen that?
10 A I don't recall, no, sir.
11 Q Might be there, might not?
12 A Could be.
13 Q Now, I want to -- just quickly on this -- you're a gun
14     guy, right, you're into firearms.
15 A Yes, sir.
16 Q You know what FFL stands for, right?
17 A Yes, sir.
18 Q Okay, FFL is federal firearms licensing.
19 A Federal firearms license, yes, sir.
20 Q And by the way, you know -- you were a helicopter pilot.
21 A Yes, sir.
22 Q UH-1 -- U1-H1, do I have that right?
23 A UH-1H.
24 Q UH-1H. That's.....
25 A H model Huey.

Page 197

1 Q .....a helicopter, isn't it?
2 A Yes, sir, it sure is.
3 Q Is that the helicopter you flew up?
4 A Yes, it is.
5 Q It is. Is that like the Vietnam era chopper?
6 A Uh-huh.
7 Q Right?
8 A Yes, sir, it is.
9 Q That they wanted -- we have a memo -- you see the -- were
10     you here for the memo when we talked about this?
11 A Yes.
12 Q They want to armor the floor and all that, wrap it around?
13 A Yes, sir.
14 Q So you flew that one up here.
15 A I did, yes, sir.
16 Q Who paid for that helicopter?
17 A The company did, Security Aviation.
18 Q Okay. I was talking about FFL. Do you know Dennis
19     Hopper?
20 A I do.
21 Q You do. He owns his own company called Quiet
22     Technologies.
23 A He does.
24 Q He manufacturers silencers.
25 A He manufactures a lot of different things, yes.

U.S.A. v. KANE  
CASE NO. 3:06-mj-00011-JDR

TRANSCRIPT OF PROCEEDINGS  
FEBRUARY 7 & 8, 2006

Page 198

1  Q  Silencers being one.
2  A  I would think so, yes, sir. I've never seen one that he's
3     manufactured, but.....
4  Q  Okay. All right. Automatic weapons?
5  A  Yes, sir.
6  Q  Okay. So were you here when I showed Exhibit 16 about the
7     letter from Mr. Hopper?
8  A  Yes, sir.
9  Q  Would you like to see that?
10 A  Sure. Thank you.
11 Q  Shows Mr. Hopper denoting to Mr. Kane aspects of his
12    business.
13 A  Yes, sir.
14 Q  So that would include automatic weapons.
15 A  Yes, it would be.
16 Q  Yes, it would?
17 A  Yes.
18 Q  And if there were any silencers, that would include those,
19    too.
20 A  NFA weapons, yes, sir.
21 Q  I'm sorry, NFA weapons?
22 A  Yes, National Firearms Act weapons.
23 Q  Yes. All right.
24 A  Yes.
25 Q  As part of your job with APD do you have to carry a

Page 199

1     firearm, do you have a sidearm you carry?
2  A  Yes, sir, I do.
3  Q  And what would you do with that during the day -- or
4     during the evening time when Mr. Kane was there?
5  A  I would purchase what I don't have yet, which is a small
6     mechanical safe, and secure that in our master bedroom.
7  Q  Okay, a small safe, not a big gun safe.
8  A  Huh-uh. I have a big gun safe, but it's -- it's
9     elsewhere, and it's secured.
10 Q  Oh, I understand. Okay, you want to keep your service
11    revolver close.
12 A  Just a handgun, correct.
13 Q  Right. All right. Where do you live, sir?
14 A  Out the end of Eagle River Road.
15 Q  Near Mr. Kane?
16 A  Several miles past.
17 Q  Mr. Avery lives out Eagle River Road, too, as well,
18    doesn't he?
19 A  I believe he does, yes, sir.
20 Q  How long has your wife known Mr. Kane?
21 A  I think she's met him two or three times.
22 Q  That's it?
23 A  Yes, sir.
24 Q  How recently is that?
25 A  I think the last time they spoke was at a -- kind of a

Page 200

1     barbecue that they had at the hangar back in October
2     sometime.
3  Q  October of '05?
4  A  Yes, sir.
5  Q  But she's only met him two or three times.
6  A  Yes, sir.
7  Q  Okay. Does your -- I mean, Mr. Kane's a pretty big guy,
8     right?
9  A  Uh-huh.
10 Q  So, Sergeant, is it fair to say that you really -- in
11    summation here -- really don't where Mr. Kane's traveled.
12 A  No, sir.
13 Q  So if I showed you his passport or he's told the probation
14    officer he's traveled, you wouldn't know anything about
15    that.
16 A  No, but I suppose if you showed it to me or his probation
17    officer showed it to me, I would be -- reasonably believe
18    that.
19 Q  Okay. But you don't have any personal knowledge of where
20    he's been.
21 A  No, sir, I do not.
22 Q  And.....
23    MR. SPAAN: Your Honor, this is.....
24    THE COURT: This is redundant.
25    MR. SPAAN: .....asked and answered.

Page 201

1     THE COURT: We don't.....
2     MR. SPAAN: I object.
3     THE COURT: .....need to ask it but once.
4  Q  Okay. Nor what he does for a living?
5     MR. SPAAN: Asked and answered, Your Honor.
6     THE COURT: All righty. I agree. Sustained.
7  Q  Truth is, you don't know much about him, do you?
8     MR. SPAAN: Asked and answered.
9     THE COURT: Last time. You may answer.
10 A  In that -- in that framework, no, I suppose not.
11 Q  All right. Appreciate it, Sergeant. Thank you.
12 A  Yes, sir.
13    THE COURT: Any redirect?
14    MR. SPAAN: Yes, just a couple, Your Honor.
15         SERGEANT TED SMITH
16 testified as follows on:
17         REDIRECT EXAMINATION
18 BY MR. SPAAN:
19 Q  Mr. Smith, Sergeant Smith, they just accused you of
20    getting a loan from this company. Did they ever ask you
21    about this yet? Did they ever ask you about this before
22    today?
23 A  Who, sir?
24 Q  Mr. Skrocki or the FBI.
25 A  No, sir.

U.S.A. v. KANE
CASE NO. 3:06-mj-00011-JDR

TRANSCRIPT OF PROCEEDINGS
FEBRUARY 7 & 8, 2006

Page 202

1  Q   Okay. So you never had an opportunity to tell anybody
2      that this money, if I understand your testimony, was a
3      loan for -- or a loan to a fellow officer who needed bail
4      money.
5  A   That's correct, sir.
6  Q   Did you lend him any money yourself?
7  A   No, sir.
8  Q   Do you know anything that'd be wrong with helping a fellow
9      officer with bail?
10 A   I don't think so, sir, or I wouldn't have been involved.
11 Q   Okay. Do you categorically deny this is a loan to you?
12 A   Absolutely.
13 Q   Your wife not being a big woman, can she use the telephone
14     okay?
15 A   Yes, sir.
16 Q   And you have no hesitation that she would not phone as
17     directed by this Court?
18 A   Absolutely not.
19     MR. SPAAN: Thank you.
20     THE COURT: Any recross?
21     MR. SKROCKI: Just one question.
22            SERGEANT TED SMITH
23 testified as follows on:
24 /
25 /

Page 203

1            RECROSS-EXAMINATION
2  BY MR. SKROCKI:
3  Q   There's -- Sergeant, there's really nothing on here that
4      says Sammy Cohen anywhere, is there?
5  A   No, sir.
6      MR. SKROCKI: Thank you.
7      THE COURT: You may step down. Thank you, sir.
8      MR. SPAAN: Thank you.
9  A   Thank you, Your Honor.
10     (Witness excused)
11     MR. SPAAN: Your Honor, we would at this time call Mr. Ray
12 Sleeth to the stand.
13     THE CLERK: Raise your right hand.
14     (Oath administered)
15     MR. SLEETH: I do.
16     THE CLERK: Thank you. Please have a seat.
17            RAY SLEETH
18 called as a witness on behalf of the defendant, testified as
19 follows on:
20            DIRECT EXAMINATION
21     THE CLERK: Please be sure to speak into the microphone at
22 all times. Please state your full name, spelling your last
23 name.
24 A   First name is Ray, last name is Sleeth. R-a-y, S-l-e-e-
25     t-h.

Page 204

1      THE CLERK: Thank you.
2  BY MR. SPAAN:
3  Q   Mr. Sleeth, good day. How are you today?
4  A   Good.
5  Q   Could you give us your employment background or your
6      current employment?
7  A   Current employment is I am basically until fully retired
8      from the military working part time at Security Aviation.
9  Q   And what is your part-time job at Security Aviation?
10 A   Gulfstream pilot, director of security, vice president.
11 Q   Okay. And what was your job specialty -- and it used to
12     be in the real old days called an MOS, but what did you
13     do -- what do you do in the Air Force?
14 A   Correction. I am in the Army currently.....
15 Q   I'm sorry.
16 A   .....and I started out in the Navy, Navy.....
17 Q   Okay.
18 A   .....SEAL.
19 Q   Okay.
20 A   Transferred over, special operations pilot.
21 Q   Okay.
22 A   And proceeded from there from injuries from Mogadishu up
23     to Washington, D.C. with the secretary of the Army all
24     over the world, and then I -- I think it was in 2002 or
25     2001 or after 9/11 transferred to Anchorage, Alaska

Page 205

1      because of injuries and flew up here.
2  Q   Okay. Now, sir, I had talked to you about being a third-
3      party custodian for Mr. Kane, correct?
4  A   Yes, sir.
5  Q   Okay, and you're -- and I asked you whether or not you
6      would make sure that you were with Mr. Kane during the
7      day; is that correct?
8  A   Yes, sir.
9  Q   And then you would deliver him to Mr. Smith, Mr. and
10     Mrs. Smith, in the evening; is that correct?
11 A   Yes, sir, or as directed by the Court.
12 Q   As directed by the Court. And if Mr. Kane -- well, you're
13     a pilot, right?
14 A   Yes, sir.
15 Q   Okay. Now, if the Court ordered you not to fly Mr. Kane
16     around, you'd obey that order, wouldn't you?
17 A   Absolutely.
18 Q   Wouldn't be good for your military career, would it, if
19     you didn't.
20 A   No, sir, it wouldn't.
21 Q   Okay. And you would follow any other directions that this
22     Court gave you.
23 A   As directed by the Court.
24 Q   Okay.
25 A   To the T.

52 (Pages 202 to 205)

Page 206

1  Q  And what kind of house do you have?
2  A  I have a two-story house out off of Northern Lights, my
3     wife, four teenage boys.
4  Q  Okay. Now, if there was a pinch and with the permission
5     of the Court and/or the probation office, would there be a
6     spot for Mr. Kane to spend the night at your house?
7  A  Yes, sir.
8  Q  And if you were directed by the Court to report
9     immediately any -- well, if they give you a list of
10    activities that Mr. Kane did, you'd be happy to do that,
11    wouldn't you?
12 A  Absolutely.
13    MR. SPAAN: Thank you. Nothing further, Your Honor.
14    THE COURT: Any cross-exam?
15    MR. SKROCKI: If I might approach the witness and remove
16 exhibits from him, Judge?
17    THE COURT: Yes.
18                RAY SLEETH
19 testified as follows on:
20              CROSS-EXAMINATION
21 BY MR. SKROCKI:
22 Q  Mr. Sleeth, good afternoon.
23 A  Afternoon.
24 Q  You work for Security Aviation.
25 A  Yes, sir, part time.

Page 207

1  Q  Gulfstream pilot?
2  A  Yes, sir.
3  Q  How many Gulfstreams do they have?
4  A  Two.
5  Q  Two? They're at Ted Stevens usually, aren't they,
6     when.....
7  A  Yes, sir.
8  Q  .....they're not being used?
9  A  Yes, sir.
10    MR. SPAAN: Your Honor, I guess I'm going to object just
11 out of fairness. This isn't supposed to be a discovery
12 exercise. I'd object to the airplanes that Security Aviation
13 has. I don't see what it has to do.....
14    THE COURT: Well, I think it's within the scope of cross-
15 examination.
16    MR. SKROCKI: If I might, Your Honor, they're owned by
17 Security Aviation and Regional Protective Services, Mr. Kane
18 works for them, they're accessible at the airport at any time.
19 It's not like he needs to buy a ticket.
20    THE COURT: These planes are not under seizure; is that
21 right?
22    MR. SKROCKI: They're not. That's the relevancy of the
23 line of inquiry.
24    THE COURT: Overruled as to the last objection.
25    MR. SPAAN: Thank you.

Page 208

1  Q  So you're a Navy SEAL or an ex-Navy SEAL, if I understood
2     you correctly?
3  A  Yes, sir.
4  Q  Okay. Mr. Kane is not, though, is he?
5  A  I'm unaware of that, sir.
6  Q  Unaware of whether he is or.....
7  A  Whether he is or whether he isn't.
8  Q  Okay, he passes himself off as being a Navy SEAL.
9  A  A lot of people do, sir.
10 Q  Is that a yes to Mr. Kane?
11 A  No, I'm -- I am unsure what his affiliation with -- with
12    the Navy SEAL teams.
13 Q  All right. Does he pass himself off as being a member
14    of -- of being a Navy SEAL?
15 A  No, I would say more along the lines of maybe have worked
16    with them in the past.
17 Q  Okay, but not being a true SEAL in the true sense of the
18    word like yourself.
19 A  It depends. I mean, I'm not real sure what his
20    affiliation with -- with the SEAL teams at this time.
21 Q  Okay. How about if -- we'll call him -- how about if he
22    was (indiscernible)? Would you characterize him as a
23    brethren like yourself in the SEALS? Had he gone through
24    the training, the underwater demolition training in San
25    Diego?

Page 209

1  A  I don't know of his class number. I don't know.
2  Q  You don't know.
3  A  No, I do not.
4  Q  Okay. You have four teens at home, four boys?
5  A  Four teenage boys, correct.
6  Q  That's a handful.
7  A  Yes, it is.
8  Q  You lose the wrestling matches every now and then?
9  A  Now I do.
10 Q  Now you do. How many rooms in the house, sir?
11 A  We have a total of four bedrooms, and -- however, my boys
12    have since they've been little stacked up Navy style.
13    They all sleep pretty much in the same room. I have an
14    office, and if it's got to be converted into a bedroom, no
15    problem.
16 Q  Okay.
17 A  He can have my master bedroom if it comes to that. We'll
18    sleep on the floor.
19 Q  You cleared that with your wife?
20 A  Yep.
21 Q  Okay. Now, I heard you mention about that there's some
22    sort of an issue if someone's in a spot that Mr. Kane can
23    stay at your house.
24 A  Yes, sir.
25 Q  Okay. What's going to happen during the day? Where are

Page 210

1    you going to be, where is he going to be with you?
2  A  Sir, I currently spoke with my military commander last
3    night and again this morning, explained the situation.
4    I'm on leave at wherever I need to go in the state based
5    on the direction of the Court, and I can handle Mr. Kane
6    all day long, or the night, whichever's required.
7  Q  Handle him in what way, what do you mean?
8  A  Whatever the Court says the custodial duties are.
9  Q  And this will be at Security Aviation hangar?
10 A  Wherever I'm directed, sir.
11 Q  Well, you tell me what your business responsibilities are
12   going to be. We need to know that.
13 A  I can sit at home all day, sir.
14 Q  Okay, but you're going to work for Security Aviation at
15   the same time, right?
16 A  Well, we have other people who can fill my duties, sir.
17 Q  Okay. Do you work out of the C Street address?
18 A  No.
19 Q  No. All out at the hangar where the airplanes are?
20 A  Yes, sir.
21 Q  So do you -- why don't you tell me what your daily plan is
22   in monitoring Mr. Kane. What do you envision is going to
23   happen here?
24 A  I would envision I'd have -- wherever Mr. Smith, we either
25   meet at his house at a particular point, he meets at my

Page 211

1    house, whatever the situation would be, I would take
2    Mr. Kane into custody, and at that point, whether it was
3    at my house or wherever directed by the Court, I would
4    obey whatever the rules are, and handle him as directed,
5    basically.
6  Q  What about during the day, sir?
7  A  If they -- if -- if I'm allowed to take him to my house, I
8    can sit at my house during the day.
9  Q  Okay, my understanding is you're going to be the daytime
10   custodian.
11 A  Yes, sir.
12 Q  Am I.....
13 A  Yes, sir.
14 Q  .....incorrect about that?
15 A  No. No, you're correct, sir.
16 Q  Okay. So you're pretty much free -- what you're saying is
17   you're pretty much free to take him wherever you want,
18   whenever, all day.
19 A  Correct. I could take him to the military facility and
20   sit him in the hangar, sir.
21 Q  But at night the turnover's going to be over to the
22   Smiths' residence.
23 A  Correct, sir.
24 Q  And why is that?
25 A  That was just the plan, and if I needed to do it 24 hours

Page 212

1    a day, I could do that.
2  Q  What do you know about Mr. Kane's travels overseas?
3  A  Nothing confirmed, sir. I'm sure we.....
4  Q  What does that mean?
5  A  I am not aware of any legal document that proves that he's
6    traveled anywhere overseas, based on what I seen
7    yesterday.
8  Q  Why don't you tell me what you know about it boys to boys.
9    What has he told you about it? Do you know anything
10   besides official documentation? I'm not trying to pin you
11   down. I just.....
12 A  No, I.....
13 Q  .....want to know what you know.
14 A  I would say that based on my previous activities that
15   we've probably crossed paths somewhere in the world,
16   possibly. I've never met him, but I've been deployed all
17   over the world myself in numerous operations.
18 Q  And does that mean you know where Mr. Kane has traveled?
19 A  No, sir, I don't.
20 Q  You don't know where he's traveled.
21 A  No, sir, I don't.
22 Q  Okay, that's a long ways of getting to where we needed to
23   be. So you don't have.....
24 A  I'm sorry, sir.
25 Q  .....any idea where he's traveled.

Page 213

1  A  No, sir, I don't.
2     MR. SPAAN: Your Honor, I'd object to Mr. Skrocki
3  objecting to his own question. He asked the question; the
4  witness should be entitled to answer it.
5     MR. SKROCKI: It's.....
6     THE COURT: Any objection to the last question and answer?
7     MR. SPAAN: No. If -- just so Mr. Sleeth's done with his
8  response.
9     THE COURT: Did you finish your answer?
10 A  Yes, sir.
11    MR. SKROCKI: Okay.
12    THE COURT: All right. Next question.
13 Q  I apologize if I got -- if I crossed over you. I
14   apologize. Okay, so you don't really know anything about
15   his foreign travel, correct?
16 A  No, sir.
17 Q  Do you know what he does for Regional Protective Services?
18 A  Basically, a consultant.
19 Q  And what does.....
20 A  Whatever -- whatever duties that is, I don't know, sir.
21 Q  You don't know what kind of consulting?
22 A  No, sir.
23 Q  Does he bring in any expertise to Regional Protective
24   Services that you know of?
25 A  I am not -- I've not ever been involved in Regional

U.S.A. v. KANE  
CASE NO. 3:06-mj-00011-JDR

TRANSCRIPT OF PROCEEDINGS  
FEBRUARY 7 & 8, 2006

### Page 214

1     Protective Services, sir, so I don't know what they do.  
2  Q  Okay, so if I understand you correctly.....  
3  A  Yes, sir.  
4  Q  .....you work over here at Security Aviation?  
5  A  Yes, sir.  
6  Q  He works over here at RPS.  
7  A  Yes, sir.  
8  Q  And you don't have any idea what happens over here.  
9  A  No, sir.  
10  Q  Under the (indiscernible).  
11  A  Until I heard of the stuff that was yesterday.  
12  Q  Okay. Do you know what his salary is for this consulting  
13     work?  
14  A  No, sir, I do not.  
15  Q  Have you ever met his wife?  
16  A  Yes, sir.  
17  Q  And her name is?  
18  A  Karen.  
19  Q  Been to his house?  
20  A  No, sir.  
21  Q  Has he been to your house?  
22  A  No, sir.  
23  Q  So this is a business relationship.  
24  A  Yes, sir.  
25     MR. SKROCKI: Thank you, sir. That's all I have.

### Page 215

1     THE COURT: Any other questions?  
2     MR. SPAAN: Nothing. Thank you, Mr. Sleeth.  
3     THE COURT: You may step down.  
4     (Witness excused)  
5     MR. SPAAN: Your Honor, we'd call Mr. Bean to the stand.  
6     THE CLERK: Raise your right hand.  
7     (Oath administered)  
8     MR. BEAN: I do.  
9     THE CLERK: Thank you. Please be seated.  
10         DAVID BEAN  
11 called as a witness on behalf of the defendant, testified as  
12 follows on:  
13         DIRECT EXAMINATION  
14     THE CLERK: Please be sure to speak into the mike, and  
15 please state your full name, spelling your last name.  
16  A  David Bean, D-a-v-i-d, B-e-a-n.  
17     THE CLERK: Thank you.  
18 BY MR. SPAAN:  
19  Q  Mr. Bean, good day. How are you?  
20  A  Good day.  
21     MR. SPAAN: Your Honor, Mr. Bean is being presented in the  
22 chance the Court would reject one of the two -- or the procedure  
23 we have suggested, as an alternate, and I'll be very brief with  
24 him, but I just want to get this testimony in for the Court's  
25 indulgence.

### Page 216

1     THE COURT: I understand. You may proceed.  
2     MR. SPAAN: Thank you.  
3  Q  Mr. Bean, what is your occupation?  
4  A  I'm currently employed at Security Aviation.  
5  Q  In what capacity, sir?  
6  A  I was hired as G3 pilot.  
7  Q  Okay.  
8  A  Gulfstream pilot.  
9  Q  And what's your current capacity?  
10  A  I'm now the senior vice president.  
11  Q  Okay. And as such where do you work?  
12  A  Upstairs with the director of operations, inside his  
13     office.  
14  Q  I'm sorry, what location is that?  
15  A  Oh, I'm sorry, on South Airpark.  
16  Q  Okay, is that by the hangar, then, or what?  
17  A  Yes, it's the administrative building next -- connected to  
18     the hangar.  
19  Q  Okay. And you have volunteered to serve as a alternate or  
20     as a third-party custodian for Mr. Kane if requested,  
21     correct?  
22  A  Yes.  
23  Q  And it's envisioned at this point that you would see --  
24     you would take care of him during the day; is that  
25     correct?

### Page 217

1  A  Yes.  
2  Q  And how would you be able to do that as vice president of  
3     Security Air, how would you take care of him?  
4  A  I can pretty much do my duties through the phone. I mean,  
5     I don't necessarily always have to be there to perform  
6     those duties.  
7  Q  Okay. And if the Court required certain -- put certain  
8     obligations on you, would you be able to comply with  
9     those, such as to phone if Mr. Kane violated any of the  
10     conditions of his.....  
11  A  Yes, absolutely.  
12  Q  Would you have any hesitation?  
13  A  None at all.  
14  Q  Okay. How long have you been in Alaska, sir?  
15  A  I arrived -- been employed 30 days today, one month.  
16  Q  Okay, so you're brand new, right?  
17  A  Yes.  
18  Q  Did you have any ties to Alaska before this?  
19  A  Yes. I was stationed in the military from '85 to '90.  
20  Q  Okay. And what sort of military practice or what branch  
21     were you in? I'm sorry.  
22  A  U. S. Army.  
23  Q  Okay. And why are you willing to do this for Mr. Kane if  
24     you've only been here 30 days?  
25  A  He struck me as an individual that needs some help, and

Page 218

1    I'm willing to do that.
2  Q  Okay. And where do you live, sir?
3  A  I live in Terrace on a Lake, right there on International
4     Way.
5  Q  And do you have a house, an apartment?
6  A  An apartment.
7  Q  Okay. And how big is the apartment?
8  A  It's one bedroom.
9  Q  And do you know anything about -- and I'm sure Mr. Skrocki
10    will go into more detail than me -- about Mr. Kane's
11    international travel?
12 A  Uh-huh.
13 Q  You do?
14 A  I'm sorry, what was the question?
15 Q  Do you know anything about where Mr. Kane might have
16    traveled in the past 10 years?
17 A  Not at all.
18    MR. SPAAN: Okay, thank you. No further questions, Your
19 Honor.
20    THE COURT: Cross-examination.
21    MR. SKROCKI: Yes, sir.
22           DAVID BEAN
23 testified as follows on:
24 /
25 /

Page 219

1           CROSS-EXAMINATION
2  BY MR. SKROCKI:
3  Q  Mr. Bean, good afternoon.
4  A  Good afternoon.
5  Q  Welcome to Alaska.
6  A  Thank you.
7  Q  Your daily contact with Mr. Kane, is it frequent,
8     nonexistent, never see him in the business setting?
9  A  I'd say I -- I saw him maybe two, three times a week at
10    the most.....
11 Q  Did you associate.....
12 A  .....at the office.
13 Q  .....with him?
14 A  I'm sorry?
15 Q  Did you associate with him?
16 A  Yes.
17 Q  Okay. And how long have you known him?
18 A  I first met him on 19 December when I came for a job
19    interview.
20 Q  He interviewed you?
21 A  Well, no, not necessarily. I made out a presentation of
22    what I could give to the company, and he listened, and
23    also in attendance was Mark Avery.
24 Q  Okay. Were you hired?
25 A  Yes.

Page 220

1  Q  Did you have to sign one of those nondisclosure
2     agreements?
3  A  Yes.
4  Q  So you've known Mr. Kane for roughly how many days?
5  A  Whatever the time is from 19 December to the present day.
6  Q  Okay. Pretty briefly.
7  A  Yes.
8  Q  All right. Know nothing about his travels abroad the last
9     10 years, correct?
10 A  No.
11 Q  Do you know what he does for Security Aviation or Regional
12    Protective Services?
13 A  Not exactly. I don't know -- what he does or what his
14    position is? What's the.....
15 Q  Yeah.
16 A  .....question?
17 Q  How about what he does.
18 A  What he does. I know he advises us on day-to-day flight
19    operations. That's.....
20 Q  Is he a.....
21 A  .....pretty much.....
22 Q  .....pilot?
23 A  I'm not sure. I know he's flown and he loves to fly, but
24    whether or not he has a rating, I don't have any knowledge
25    of that.

Page 221

1  Q  Does he own any airplanes to your knowledge?
2  A  I don't know for a fact if he owns them. I know he's
3     flown in them.
4  Q  Okay. Anything you know that he might own?
5  A  Might own?
6  Q  Yeah, might own. What kind of airplane he might own.
7  A  I tell you, before yesterday I didn't even know -- I saw
8     in writing that Mark Avery was the owner of the company.
9     I mean, if you're talking about an assumption I can make,
10    I can -- he may own a Texan or a Corsair.
11    MR. SPAAN: Your Honor.....
12 Q  He owns a T6 Texan?
13    MR. SPAAN: .....I'd just like it clarified who owns,
14 Avery or Kane. I mean, and.....
15 Q  Mr. Kane?
16 A  Pardon?
17 Q  Is that Mr. Kane you were talking about owning the Texan
18    and the Corsair?
19 A  That's assumption on my part if that -- I'm not sure if
20    I'm supposed to make assumptions or not, but I know I
21    haven't seen anything in legal writing that says he owns a
22    plane or registration.
23 Q  Okay, maybe there's some chitchat that might confirm that
24    for you. You heard it, right?
25 A  Well, I heard it was his plane.

U.S.A. v. KANE  
CASE NO. 3:06-mj-00011-JDR

TRANSCRIPT OF PROCEEDINGS  
FEBRUARY 7 & 8, 2006

Page 222

```
 1  Q  Yeah, the Corsair's a World War II fighter, right?
 2  A  Yes.
 3  Q  Texan's a World War II trainer, right?
 4  A  Yes.
 5  Q  Those might be his?
 6  A  Might be.  Might be Mark Avery's, too.
 7  Q  Oh, Mr. Avery's, too?
 8  A  I don't know.
 9  Q  Okay.  All right, leave it at that.  Now, you
10     mentioned -- let me -- I'm sorry.  Do you know exactly
11     what company he works for?  Do you have any idea?
12  A  To exactly what.....
13  Q  Either Security Aviation or Regional Protective Services.
14     Is that clear in your mind?
15  A  No.
16  Q  Is it clear in your mind what he does for those companies?
17  A  All I know about is Security Aviation and -- and when the
18     day-to-day, three times a week, I'd say average what I've
19     seen him advise me on different issues.
20  Q  Do you know what his salary is?
21  A  No.
22  Q  Do you know if the company gives him a car?
23  A  No.
24  Q  You ever been to his house?  Probably not.
25  A  No.
```

Page 223

```
 1  Q  Bear with me.  Never met his family?
 2  A  No.
 3  Q  Do you know if he lived in Oregon at one point in time?
 4  A  No.
 5  Q  Do you know where he's lived besides here in Alaska right
 6     now?
 7  A  No.
 8  Q  So, Mr. Bean, what's the plan as far as you understand it
 9     with regard to your third-party custodianship of Mr. Kane?
10  A  What is my.....
11  Q  What -- how do you understand the plan to be.  You know,
12     he's -- if the Court agrees, Mr. Kane gets let out, he's
13     going to be in your custody, so what's the plan?
14  A  Plan is stay -- he'll -- he's got to be within sight and
15     sound of me at all times.
16  Q  This is while you're working during the day.
17  A  Yes.  I kind of envisioned since -- I -- I'd stay home and
18     work out of the house over the phone.
19  Q  And you're.....
20  A  Unless.....
21  Q  .....still going to get paid.....
22  A  But we -- we -- but what I do understand, we -- there's no
23     restriction to go drive around or any other places we
24     can't go.
25  Q  And you would still draw a salary for that?
```

Page 224

```
 1  A  Yes.
 2  Q  Someone clarify that with you?
 3  A  No, I haven't -- I haven't actually checked on that for
 4     sure, no.
 5  Q  Oh, so you don't know with whoever, with Mark Avery?
 6  A  He would be the person I would go to, yes.
 7  Q  Okay, you haven't run this by him yet.
 8  A  No.
 9  Q  Okay, so you're not quite sure this is going to get
10     com-- well, the company hasn't approved it.
11  A  No.
12  Q  And you live on International Airport Road.
13  A  Yes.
14  Q  Right off of it?
15  A  Uh-huh.
16  Q  Back there close to the airport, correct?
17  A  Yes.
18  Q  Do you actually fly the G3's?
19  A  No, I'm not current right now.
20  Q  You working on that?
21  A  No, I haven't done anything toward that.
22     MR. SKROCKI:  Thank you, sir.  That's all I have, Judge.
23     MR. SPAAN:  Your Honor, I'd move in Defendant's A at this
24  time.
25     MR. SKROCKI:  Your Honor, I'm going to object as to
```

Page 225

```
 1  relevancy grounds, and, frankly, the copy we got yesterday was
 2  missing the header information as to the origin of the email.
 3     THE COURT:  Exhibit A is denied.  It goes to the
 4  preliminary hearing, but not the bail hearing.  Denied in that
 5  part of the case.
 6     MR. SPAAN:  Okay.  Thank you, Mr. Bean.  I have nothing
 7  further.
 8     THE COURT:  You may step down.
 9     (Witness excused)
10     THE COURT:  Mr. Spaan, you're reviewing to see if you have
11  any other evidence?
12     MR. SPAAN:  No, Your Honor, I'm -- we're done.
13     THE COURT:  All right.
14     MR. SPAAN:  Thank you.
15     THE COURT:  Does the Government.....
16     MR. SPAAN:  I apologize.
17     THE COURT:  .....have any rebuttal evidence?
18     MR. SKROCKI:  No, sir.
19     THE COURT:  The evidence is declared closed.  I'm going to
20  hear a brief summary of position, first from the Government, and
21  then the defendant.
22     MR. SKROCKI:  Judge, the issue -- the real issue here
23  before you today is not about what pod was active, any of that.
24  The real issue here is character and what you've got here.  The
25  weight of the evidence establishes beyond -- we've established
```

Page 226

1  probable cause that the pods were found in the hangar. They
2  were attributed to Mr. Kane. He made statements that now he
3  could go target practice. That's been established. The issue
4  here before you is can you in good faith trust Mr. Kane, not the
5  third parties, who I think have the best of intentions, but can
6  Mr. Kane be trusted to be released. It is beyond dispute that
7  he is a con man and a fraud.
8      We heard testimony yesterday about these confidential
9  cover sheets, secret cover sheets, that they're part of some
10 collection. They somehow managed to migrate themselves to
11 Mr. Kane's place of employment. We have access to substantial
12 sums of money. Assuming -- even giving him the benefit of the
13 doubt that it belonged to Security Aviation, they trusted him
14 enough to have these substantial amounts of funds in his
15 residence, along with his passport, along with his wallet, along
16 with identification that belongs to different states,
17 Washington, D.C., District of Columbia, for example. We have
18 badges galore that at any time he could flash. He might have
19 access to others that we don't know about. In fact, nobody here
20 really knows much about Mr. Kane at all, except for the fact
21 that what was found in his house establishes that he will run at
22 the drop of a hat, because the game is up.
23     Now, I don't doubt that the third parties have the best of
24 intentions in coming in and making themself available to assist
25 Mr. Ka'ne. That's their prerogative. The problem is none of

Page 227

1  them have a glimpse of what the Court has glimpsed the last two
2  days with regard to the real Robert Kane. None of them have
3  seen it. They don't know where his travel is. They don't know
4  what he does for a living. We've got evidence that he wants to
5  keep himself off the paperwork of a company he works for. He
6  hasn't applied for a PFD, and in this state, if you don't apply
7  for a PFD, that's a pretty big deal. This is a guy, Judge, who
8  wants to live under and off the radar screen, and he's done a
9  pretty good job of it. He's doing it for a reason. We submit
10 that there are any -- aren't any set of circumstances here that
11 would adequately guarantee, no matter how good the third parties
12 are or what kind of arrangement the Court might make, that would
13 guarantee his appearance, and the reasons are these.
14     We know he's got fake passports. We know he's got access
15 to a bunch of cash. He wasn't honest with the pretrial services
16 officer. He says I got a bank account, I don't know how much is
17 in it. Maybe that's because he's got a bunch of cash squirreled
18 away, he doesn't use banks, for obvious reasons. There's tax
19 implications and everything else. Now he knows he's being
20 looked at. He has every reason to go and no reason to stay.
21 His house is paid by his company. His cars are paid by his
22 company. If he ever got pulled over and they ran the plate, it
23 would come back to RPS. Nothing in this case comes back to
24 Robert Frazier Kane, and for those reasons there aren't any set
25 of circumstances -- we submit he would take the first

Page 228

1  opportunity to skip town and never be seen again.
2      Now, the proposal that we have -- I'm not even sure we
3  have much of a proposal. What we have is the Smiths will take
4  care of him at night, and, Judge, I was waiting to hear from
5  Mrs. Smith. I've not heard from Mrs. Smith. I don't know how
6  comfortable she is with this arrangement. Got no idea.
7      The day custodianship isn't going to work, either. It's
8  all about being access to the airplanes, it's all about being at
9  the airport, and, unfortunately, that's a factor that works
10 against it by virtue of whatever employment he has with these
11 companies puts him right then and there. You've got people
12 who've provided him access to weapons. Federal firearms
13 licensees are giving up their whole stock to this individual.
14 None of this makes any sense, and there's just no way that the
15 Court can gamble on releasing him based on these facts. That's
16 all I have. Thank you.
17     THE COURT: Mr. Spaan.
18     MR. SPAAN: Yeah, thank you, Your Honor. I'd like to be a
19 little old-fashioned. Whoops, I'm sorry, and start with the
20 eighth amendment to the constitution, which prohibits excessive
21 bail.
22     THE COURT: You're skipping over the Magna Carta?
23     MR. SPAAN: If you were Judge Singleton I might, Your
24 Honor, but, no.
25     (Laughter)

Page 229

1      MR. SPAAN: The case law, the statutes, and what do we
2  have? What we have pretrial is a presumption excepting capital
3  cases, which this isn't, that Mr. Kane should be released under
4  the least restrictive conditions. What I've heard from
5  Mr. Skrocki is we proved he's a con man and fraud. I must have
6  been at a different hearing because I didn't hear any evidence.
7  I saw some cards, which when the witnesses were asked said,
8  well, there's nothing wrong with this. I've heard some people
9  say I don't know how much money is in that -- in the evidence.
10 We need to go on the facts. He has a constitutional right to
11 bail, a statutory right to bail, and why? He is charged. He's
12 not convicted of anything.
13     Mr. Skrocki crows about the evidence. You heard our offer
14 of proof. I could -- I think Mr. Kane can't wait to try this
15 case. It's going -- it -- he's not going anyplace. He has a
16 wife. He has three children. He has a mom. He has a dad. He
17 has a friend in Anchorage, Alaska. He also has -- I have a need
18 to work with Mr. Kane and prepare for the defense of these
19 charges. This is one of the rea-- number one, there's
20 presumption of innocence. Two, he ought not to be kept in
21 custody, and what have we heard? Well, there's a lot of things
22 we don't know. Well, that's different than saying we proved
23 facts Y and Z.
24     Now, what we have, what's disappeared, is the silencer.
25 Whoops. Just a mistake. Why on the inventory .45 silencer.

Page 230

1  Talked to Mr. Campe or -- not Mr. Campe, I'm sorry, I apologize,
2  through the other agent -- oh, yeah, looked like a silencer to
3  me. That crumbles. We've had an Anchorage police officer be
4  accused of taking a loan and lying.
5      Now, what are the facts we have besides the family that
6  Mr. Kane has? We know that he has access to cash. Nothing
7  illegal about that. The Government has his cash, and the
8  restrictions on his release can be that he doesn't have over 10
9  bucks, but we haven't made a motion for return of that property
10 yet, but he explained that -- well, he didn't explain, the agent
11 said it said Security Aviation on the biggest bundle of cash,
12 okay?
13     We don't know where he's been. Well, that's not a reason
14 to deny him the right to bail to help with his defense, to see
15 his family and friends. We don't know where he's been. So
16 what? He -- they have his passport, and phony passports, the
17 only passport I heard of that could even maybe come under that
18 deal is an expired passport that Mrs. Kane had, which is seized,
19 and which I asked the agent, well, are you aware that this was
20 with her working in the Knights of Malta. Well, no, I'm not.
21 There's been no proof that it's illegal for Mrs. Kane to have a
22 Greek passport. I mean, an expired Greek passport. Mr. Kane
23 clearly had a passport. There's nothing wrong with that. And,
24 again, we got conditions. I mean, we range from an OR release
25 to a third party, and the third party, Your Honor, could be

Page 231

1  actually jumped up with an ankle monitor. There's companies
2  other than Mr. Kane's that do these things. There's no reason
3  to doubt the good faith and the honesty of these witnesses we
4  put on the stand. If Your Honor wants to inquire of Sergeant
5  Smith what -- whether this wife's good for it, I'll give you a
6  proffer it was her idea. She wanted to do it, and she will do
7  it.
8      We want to work with the Court to get Mr. Kane out of
9  jail. He deserves to be out of jail. So the only argument I
10 heard is a flight risk, and there can be no credible evidence
11 that he's a danger to the community, and we'd look at Mr. Kane's
12 record. Now, let's not talk about what we suspect, well, this
13 guy's pretty suspicious, he's a con man. What do we have? he
14 had a beef when he was a kid. He did one day and he paid 50
15 bucks. He had another case that was dismissed. Sergeant Smith
16 explained why that was dismissed, because he was working with
17 law enforcement. He was an informant. So that's what we have.
18 No record that he would not appear before this Court.
19     He demands -- I don't know, Your Honor. I mean, I would
20 ask that the we work and get some conditions that could get him
21 out, and, Your Honor, if you said -- I mean, in order to take
22 Mr. Skrocki's -- you got to assume that one of these witnesses
23 is going to get in a jet and fly Mr. Kane someplace. That's
24 ludicrous. I mean, they'd go to jail. They're not going to do
25 that. And if they flew him to the Philippines I've got an

Page 232

1  exhibit right here, which is there's a extradition treaty with
2  the Philippines. There's never been one request from the United
3  States of America charged -- or refused. Now, what we have --
4  and I'm going to hand this to the Court or ask.....
5      THE COURT: No, you're not. The evidence is closed.
6      MR. SPAAN: Okay.
7      THE COURT: I can take.....
8      MR. SPAAN: Well, just take notice.....
9      THE COURT: .....judicial notice.....
10     MR. SPAAN: Okay, fine.
11     THE COURT: .....of any extradition treaty.
12     MR. SPAAN: Okay, there is an extradition treaty, okay?
13 We have given you the facts to release this man to allow him to
14 help with his defense, and if we got to craft it where don't go
15 buy airplanes, but -- fine. And if there's a third-party
16 monitor, these people have pledged and given their word, they
17 have no record, that they would phone. They would comply with
18 any court condition.
19     I was just going to say the danger to the community, Your
20 Honor, I think is not even an issue. He's had guns which he's
21 legally allowed to possess. I'd answer any questions the Court
22 might have.
23     THE COURT: Thank you. The burden of proof is on the
24 Government. Any reply?
25     MR. SKROCKI: Yes. It's not about the third parties, it's

Page 233

1  about Mr. Kane. That's what this is all about. He had access
2  to cash and guns, destructive devices, aircraft to use them
3  with, his name is on these aircraft, and I don't think the best
4  of intentions of any of these people would keep him from running
5  when he had the chance. Extradition treaties, they're
6  worthless. It would take months, years, to get people back.
7      That's not a realistic -- it's not something realistic for
8  the Court to consider, but what's realistic here is that no
9  problem, Judge, you look at some cash in the house. Is it
10 illegal? No. Other ID, is that illegal? No. You add all
11 these things together, all the mosaics, all those little pieces
12 add up to the big puzzle or all the big picture that means
13 flight risk. That's what we're talking about here.
14     We have a combination of both -- we have a combination of
15 danger to the community -- Government would say, you know, the
16 danger is just as significant as it is of a flight risk. We
17 don't have Mrs. Smith. We don't have an identifiable plan.
18 It's their burden to put up a plan, not the Court's, and we
19 don't have one. Even if they did, we'd still be saying the same
20 thing we're saying now, that he would cut and run at the first
21 opportunity. Thank you.
22     THE COURT: The Court has heard the evidence and will now
23 rule upon the matter. The defendant does have a right to bail.
24 It's a constitutional right to reasonable bail. It is not a
25 guarantee the defendant will be released on pretrial bail.

Page 234

1   The Court must consider the nature of the offense in
2   deciding the totality of circumstances as to whether the
3   defendant is a suitable flight risk or danger to the community.
4   I notice in one case, in the Rishkamp (ph) case of the sixth
5   circuit, defendant was convicted of knowing possession of an
6   unregistered rocket launcher. The court of appeals held that
7   the rocket launcher was a destructive device within the statute
8   requiring registration. The statute defining destructive device
9   does not demand that the device operate necessarily as
10  originally intended. I'm aware of the offense charged in the
11  complaint. Case law indicates that the rocket launcher is
12  considered more than a mere gun. A rocket launcher is a high-
13  powered weapon designed for use against hardened targets such as
14  armored tanks.
15      And let me say at the outset that we've heard a lot of
16  evidence in the last two days and it makes a good reading, I
17  should put my Sidney Sheldon book aside and just try to delve
18  into this case. I think every time a rock is turned over it's
19  raised some unanswered questions, but this is not the time to
20  sort out the case. That's done with all of the evidence, and
21  the fact finder decides what's presented to it and the facts of
22  the case based on the charges brought. So my duty is to
23  determine, having found probable cause, whether the defendant is
24  suitable for bail within the context of this case, all of the
25  circumstances, including the nature of the charge.

Page 235

1       Several -- there are several courts that have found
2   possession of destructive device in violation of section 5861(d)
3   as a crime of violence as defined in section 3156(a)(4), and
4   I'll just mention the Newman (ph) case from the tenth circuit.
5   There's the Dodge case from the district of Connecticut. These
6   cases reason that -- for example, that pipe bombs are inherently
7   dangerous weapons. There are cases about machine guns. This
8   case is unique, but certainly we're not dealing with the usual
9   failure to register a pistol.
10      The bail reform act sets forth what the Court should
11  consider in determining the conditions of release. Section
12  3142(g) sets forth those conditions. Here, even though it's not
13  argued as a presumption of detention, and there's some cases
14  that have so held similar offenses have been, it is a crime --
15  some courts would characterize it as a crime of violence. So I
16  must consider the potential danger which an unregistered firearm
17  in this case poses to society. The simple possession of such a
18  firearm by a private citizen, even one with no prior criminal
19  record, is a federal felony offense.
20      Because of the dangerousness and high likelihood of it
21  being employed to inflict grievous injury on innocent victims,
22  the simple possession of such a firearm has been held to be a
23  crime of violence, without the necessity of the Government
24  providing that the particular firearm was actually used.
25  Possession alone is enough, because of the inherent danger

Page 236

1   nature of the firearm.
2       Now, with respect to the prongs of the bail reform act,
3   the Government relies on primarily the risk of flight. Where
4   detention is sought in risk of flight the Government bears a
5   burden of proving that the defendant is a flight risk by a
6   preponderance of the evidence. The Government then must prove
7   that he's a serious risk of flight if not detained, and that
8   there are no conditions that the Court could fashion which would
9   reasonably assure the defendant's appearance. I note that the
10  pretrial service report recommends detention.
11      The defendant has a wife. He has a job here in Anchorage.
12  He has contacts with the community. He has also resided in
13  other places such as Singapore and the Philippines. He had a
14  valid passport and an expired passport. He's traveled to a lot
15  of countries. I don't need to list those, but he certainly has
16  had a propensity to travel in the past and is familiar with
17  traveling abroad. We know from the pretrial service report that
18  he's employed by Avery & Associates. We've heard today some
19  people associated with the business and with the defendant. I
20  can't tell you much about what he does as a consultant, what he
21  earns, whether he's a pilot, where he's traveled, and either
22  they're somewhat evasive in what they say, or the defendant
23  simply has an alter ego, if you will, that he's just kept from
24  most of the people around him. According to the FBI he has no
25  known property in his name. He has a house, but I don't know in

Page 237

1   whose name it is. He does have a minor or insignificant
2   criminal record, so I do consider that fact.
3       He's portrayed himself, based on what I've heard, as a
4   person who operates undercover, a military type, refers to
5   himself as commander, a person who has credentials from other
6   locations. There's a certain clandestine aspect to his
7   operations. Credentials as a Philippine police officer. His
8   vehicle had a red/blue strobe light, contained a shotgun. He
9   has contacts in the Philippines, he's lived there, his in-laws
10  are there. I believe that he owns property there. He's been a
11  frequent traveler to foreign countries. He claims to have
12  worked for the FBI for many years. The FBI is big. It's a big
13  country. The FBI here from what I have before me, they've never
14  heard of his employment.
15      So there may be two sides to that, but it's not all come
16  out, and I have to base my decision today on what I hear, and
17  bail is not just for tomorrow and the next day, but throughout
18  the case. Defendants sometimes remain until the case is worked
19  a little bit, and then they get some idea of where it's headed.
20  Sometimes defendants flee before sentencing after conviction.
21  Each case is different, because other people have fled even
22  jumped the bail when I've set cash or surety bail, et cetera,
23  this is a unique case, and I realize that. It simply means that
24  the Court has some experience and has to gauge its decision
25  based on what it hears.

Page 238

1   So I don't know in terms of the evidence about -- I won't
2   say laundry money, but the clandestine aspect, the loan, for
3   example, keeping your name off of it, keeping your name off of
4   business documents, yet the defendant apparently has directed
5   some acquisitions like the rocket based on the Government's case
6   so far, was there when the crate was opened, commented about
7   using it. His name was on a jet for which it would -- could be
8   used. He told the TSA officer that FAA can't see the pod. We
9   don't know what that means, but there is evidence of
10  impersonation or a second persona. The documents, the photos,
11  the medals, the credentials, the concealed weapon permit,
12  carrying a concealed weapon. There's no record of service in
13  the U. S. military. The contents of the briefcase that the wife
14  identified that he carries to work, cash, international bank
15  cards, questionable foreign and UN credentials. It's
16  incongruous with the lifestyle of an upstanding citizen. Maybe
17  as an informant for the government, a secret agent, you have two
18  lives. I don't know.
19      Cover sheets that are indicated to be top secret, nothing
20  the government agents here have recognized. Money by wire
21  transfer receipts. Lots of firearms, including three AR-15
22  types, a silencer which was hidden, and, as the agent said, is
23  illegal. We haven't heard the expert from the Government. We
24  haven't heard whether that silencer could be used or not. There
25  may be two sides to that, and that's just simply part of the

Page 239

1   evidence. A .50 caliber rifle with a scope. He's had access to
2   large amounts of cash. His wife indicated that he received
3   $20,000 a month.
4       We've had some additional evidence today that the Court
5   considers. There's some third-party custodians that are
6   offered. There's an application for certificate for permit for
7   residence in Bahama. It was blank. I suppose if it had been
8   filled out it might have been sent somewhere and it wouldn't be
9   there. Who knows what that means, but certainly it's consistent
10  with somebody that is able to live somewhere else. Satellite
11  phone with a large antenna. We heard more about the UN top
12  secret cover sheets today. Mrs. Smith is offered as a
13  custodian. Apparently she's only met the defendant a couple of
14  times. The silencer, again, had U. S. Government and had a
15  manufacturer's name on it, so I can't say that it's simply a
16  toy. It may or may not be operational or it might have been
17  something designated to put on a desk like some armament or
18  warfare somebody collects. I've not heard anything about
19  collecting.
20      So the defendant has insulated himself from those in
21  essence who would serve as custodians. They know very little
22  about him and his connections and his friends. In fact,
23  Mr. Sleeth, among others, didn't know anything about the
24  defendant's past travels. So we don't know who's using whom
25  here in terms of sorting out all of the facts of the case.

Page 240

1   The third-party release that's offered basically is -- the
2   first plan would be a chain of custodians, one in the daytime
3   and one in the evening, which would be some passing off of the
4   defendant. The evidence indicates the defendant has access to
5   pilots and planes and people who can fly. Whether or not he is
6   a pilot, I don't know. Putting all this together, I think that
7   it points in the direction of significant flight risk, and I
8   don't think that third-party custodians who would report any
9   violation is enough to put this in check.
10      Simply -- there's also some mixed loyalty with the people
11  that have been offered. Working for Security Aviation,
12  Mr. Bean, who's a proposed daytime custodian, why did he want to
13  do that. He said because the defendant needs help. He
14  advised -- he said the defendant advises him on day-to-day
15  operations, but I don't know what he does, and so here's
16  somebody that's going to supervise a person and is employed by
17  Security Aviation.
18      Ted Smith was withdrawn as a third-party custodian. He
19  explained that. He certainly has an interest in the case, and
20  his suggestion was that his wife could perhaps step up and be
21  the custodian.
22      The -- Mr. Sleeth is a Gulfstream pilot for Security
23  Aviation. I think that's a dual loyalty, frankly. I think
24  there's a pos-- significant possibility that the defendant would
25  direct something in the way of flight without his custodians

Page 241

1   even know who he's talking to or what he's directing them to do.
2   There's just -- this is not a simple case. And Mr. Sleeth said
3   why he was proposed as a custodian. He used a phrase, business
4   relationship, and to me that's an obligation to both. So he
5   doesn't know much about the defendant's lifestyle, either.
6       So I think in light of the nature of the case, even
7   without using a presumption of detention based on a crime of
8   violence, that the Government has carried its burden of proof by
9   a preponderance of the evidence to show that there is a flight
10  risk that cannot be met by conditions of release at the present
11  time, and so for that reason the Court will enter a detention
12  order. And I will ask the Government to keep the exhibit that
13  you have, the scope, and the clerk can return the original
14  exhibits to those parties who offered them.
15      MR. SKROCKI: Yes, sir.
16      THE COURT: Anything else that we might take up at this
17  time that relates to the bail hearing?
18      MR. SKROCKI: Nothing from us. Thank you.
19      MR. SPAAN: Not at this time, Your Honor.
20      THE COURT: We'll be in recess.
21      THE CLERK: All rise. Court stands in recess.
22      (Court recessed)
23  4:23:20
24      (Court recessed at 9:00 a.m.)
25  /

61 (Pages 238 to 241)

U.S.A. v. KANE  
CASE NO. 3:06-mj-00011-JDR

TRANSCRIPT OF PROCEEDINGS  
FEBRUARY 7 & 8, 2006

Page 242

1    TRANSCRIBER'S CERTIFICATE
2
3        I, Dana J. Kelly, Certified Electronic Transcriber, hereby
4
5    certify:
6
7        That the foregoing pages numbered 1 through 241 are a
8
9    true, accurate and complete transcript of proceedings in Case
10
11   No. 3:06-mj-00011-JDR, U.S.A. v. Kane, transcribed by me from a
12
13   copy of the electronic sound recording to the best of my
14
15   knowledge and ability.
16
17       DATED: February 16, 2006.
18
19
20       _____
21       Dana J. Kelly, CET
22
23
24
25

62 (Page 242)